# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
REX ALLAN KREBS,
Defendant and Appellant.

S099439

San Luis Obispo County Superior Court
No. F283378

November 21, 2019

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Chin, Corrigan, Liu, Cuéllar, Kruger, and Groban concurred.

PEOPLE v. KREBS

S099439

Opinion of the Court by Cantil-Sakauye, C. J.

A jury convicted defendant Rex Allan Krebs of the first degree murder of Rachel Newhouse and Aundria Crawford (Pen. Code, § 187),[1] one count of kidnapping Newhouse to commit rape and one count of kidnapping Crawford to commit rape and sodomy (§ 209, subd. (b)), one count of rape by force of Newhouse and two counts of rape by force of Crawford (§ 261, subd. (a)(2)), one count of sodomy by force of Crawford (§ 286, subd. (c)), and one count of first degree burglary (§ 459). The jury found true the special circumstance allegations that defendant committed multiple murders, that the murder of Newhouse was committed while engaged in kidnapping and rape, and that the murder of Crawford was committed while engaged in kidnapping, rape, and sodomy. (§ 190.2, subd. (a)(3), (17).) Defendant admitted prior convictions for rape, sodomy, assault to commit rape, residential burglary, and felony grand theft. The court found the prior convictions to be true.

Following the penalty phase of the trial, the jury returned verdicts of death for each of the two murder convictions. The trial court denied defendant's motion to modify the death penalty verdict and his motion for a new trial. (§ 190.4, subd. (e).) The court sentenced defendant to death for each of the murder convictions. It also sentenced him to a total of 166 years

_____

[1]   All further statutory references are to the Penal Code unless otherwise indicated.

1

to life with the possibility of parole for the other offenses and enhancements, a sentence it stayed pursuant to section 654. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. BACKGROUND

### A. Evidence at the Guilt Phase

#### 1. Investigation prior to defendant's confession

Rachel Newhouse, a student at California Polytechnic State University at San Luis Obispo, was last seen on November 12, 1998, at about 11:30 p.m., in Tortilla Flats, a restaurant and bar in San Luis Obispo. Blood drops were found an hour or so later on the Jennifer Street Bridge, a pedestrian bridge that Newhouse would have crossed if she walked home from Tortilla Flats. Samples taken from blood recovered from the bridge and a nearby parking lot matched blood samples from Newhouse's parents.

Aundria Crawford, a student at Cuesta College who lived in San Luis Obispo, spoke with a friend by telephone until 2:46 a.m. on March 11, 1999.[2] Crawford missed an appointment and failed to respond to texts on March 11, and an investigation begun the next day failed to locate her.

Defendant's parole officer, David Zaragoza, thought there were similarities between the description in a newspaper article of the abduction of Crawford and defendant's prior crimes. In mid-March, he visited defendant at his residence. When defendant came out to meet Zaragoza, he was walking as if in pain, and he was holding his rib area. Defendant stated that he

---

[2] All further date references are to the year 1999 unless otherwise specified.

had hurt his ribs when he fell off a wall into some firewood, but Zaragoza was suspicious because he did not see any injuries to defendant's hands or arms. Zaragoza reported his suspicions to the lead investigator of the Crawford abduction.

Two days later, Zaragoza and other agents conducted a parole search of defendant's residence. Among the items seized was an eight-ball keychain. Zaragoza also found BBs. One of defendant's parole conditions was that he was not allowed to possess objects resembling a firearm. The next day, Zaragoza seized a BB gun at defendant's place of employment and caused defendant to be arrested and transported to the San Luis Obispo County jail.

Larry Hobson, an investigator with the County of San Luis Obispo District Attorney's Office, interviewed defendant a day after his arrest. At this point, defendant had been arrested for violating his parole by possessing a simulated firearm and drinking alcohol. When Hobson asked defendant if he had any idea why he was being interviewed, defendant stated he assumed it related to the disappearance of the two victims, because defendant was on parole for rape and had a prior sex offense. He did not recall where he was the day Newhouse disappeared. However, defendant said he stayed home all night on March 10, the night of Crawford's disappearance. At about 8:00 a.m. the next day, he walked to a woodpile, and his landlord's daughter, Debra Wright, stopped and talked to him briefly. He said he had slipped on some lattice work and fallen into the woodpile, injuring his ribs.

Defendant denied ever driving down Crawford's street or seeing the victims except on fliers posted around San Luis Obispo. Hobson asked where defendant had acquired the eight-

ball keychain found during the parole search, and he said he found it on the yard while in Soledad prison in 1996. In response to Hobson's telling defendant that he might have to question him again, defendant said he was willing to do anything to prove that he was not responsible for the abductions, and he gave Hobson permission to search his vehicle and his residence.

A few days later, a search of defendant's truck disclosed duct tape, binoculars, and a bottle of stain remover. Also, some of the carpet had been cut out, and one of the jump seats was missing.

In early April, Hobson interviewed defendant a second time. Defendant gave an account of his whereabouts on March 11 that was partly inconsistent with his prior statements. When asked why someone would identify him or his truck in the vicinity of Crawford's house, he stated he had driven down Crawford's street two or three times. With respect to the eight-ball keychain that defendant claimed to have found in 1996, Hobson asserted that it had not been manufactured until 1998. Defendant responded, " 'that's strange.' "

Five days later, a search of defendant's home led to the discovery of the jump seat from his truck. The seat had blood stains on it.

On April 21, Hobson interviewed defendant a third time.[3] Defendant again had difficulty recalling what he did on March 11. Hobson and defendant discussed defendant's prior sex

---

[3] In this appeal, defendant challenges the trial court's admission of his various statements made after this interview under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). We discuss the circumstances of the interviews in more detail in part II.B.1, *post*.

crimes, and defendant admitted that he fantasized about abducting women but claimed to have "worked through" that. Hobson then showed defendant the eight-ball keychain and said it belonged to Crawford. Defendant denied the keychain was the one that had been found in his home. Hobson told defendant that the police had found the missing jump seat, and that there were traces of Newhouse's blood on it. Defendant then stopped talking for about 15 minutes while Hobson kept up a monologue. Hobson asked defendant to take him to the victims, and defendant stated he did not want to help Hobson at that time. Hobson eventually returned defendant to the county jail.

### 2. *Defendant's confession*

On April 22, Hobson returned to the jail, and correctional officers brought defendant to an employee breakroom to meet him. Some minutes into the conversation, defendant asked what Hobson wanted him to say, and Hobson said he wanted the truth. Defendant responded, "okay" and said that he wanted to talk somewhere else. Before transporting defendant from the jail and after giving him *Miranda* warnings, Hobson asked defendant if he was responsible for the disappearance and death of Newhouse and Crawford. Defendant responded, "yes." Hobson then took defendant to the police department, where the ensuing interrogation was recorded. The jury was shown the videotape, during which defendant described what he had done to the victims.[4]

---

[4] Video recordings of interviews conducted on April 22 and April 27 were played for the jury, and transcripts of these two interviews were provided to assist the jury. The jury was also shown a video recording made on April 22, which depicted

Defendant stated that starting at about 8:30 p.m. on November 12, 1998, he drank six or seven shots of whiskey. At about midnight, he saw Newhouse walking down a street in San Luis Obispo. He told Hobson he had a premonition that Newhouse would walk across a bridge, so he parked his truck and walked onto the bridge. As Newhouse walked behind him on the bridge, defendant turned around and hit her on the jaw with his fist. When she screamed, defendant picked her up and threw her down on her back. Then he hit her again, knocking her unconscious, and dragged her by her hair down the stairs. At this point, she was bleeding from the back of her head and about her face. When he reached his truck, he put the still-unconscious Newhouse behind the front passenger seat in the area where the jump seats were located. He got rope from the bed of his truck and tied her hands behind her back. He then drove along railroad tracks for about 200 yards, where he stopped and used the same rope to tie her legs. Finally, he reached into her pants, ripped off her panties, stuffed them in her mouth, and tied the rope through her mouth.

Beside the road that led to defendant's residence was an abandoned cabin. Defendant drove to the cabin, carried Newhouse inside, removed her pants, and raped her. She was conscious by this time, and was cursing at him. After he raped her, he re-tied her legs, hogtied her legs to her hands, and stuffed her panties back into her mouth. Then he drove up to his residence, leaving Newhouse in the cabin. He returned to the cabin 15 or 20 minutes later and found Newhouse dead. He

_____

defendant pointing out the victims' burial sites and items at his house. In addition, Hobson testified about his subsequent interviews of defendant in late April and early May.

told Hobson that when he left her, the rope he had tied around her neck was not in a position that would have prevented her from breathing. Hobson asked whether defendant was saying that Newhouse's struggling had caused her strangulation. He responded, "That or her legs relaxed or something, I don't know." Defendant told Hobson that he panicked, put her body behind the cabin, and went home.

The next morning, defendant drove his truck past a spot where he had been cutting wood and dug a grave. He returned home and, at some point, cleaned blood from his truck. When he was unable to remove all of the blood, he cut out portions of carpet, threw them in a dumpster, and put the stained jump seat in his home. Sometime between 11:00 p.m. and midnight, he put Newhouse's body in the back of his truck, drove to where he had dug a grave, and buried it.

Turning to the Crawford case, defendant stated that the first time he saw her he was driving by her house as she was getting out of her car. He followed her back to the house, got out of his truck, and looked at her through a small gap at the bottom of the curtains on a window. He left after a few minutes.

Over the following days, defendant twice more returned to Crawford's house to watch her. Each time he was intoxicated. Finally, defendant returned for a third time, knowing that he was going to abduct her. Again intoxicated, defendant was not certain what time he went to her house, but it could have been as late as 2:00 or 3:00 a.m.

Defendant found a small bathroom window that was not latched, removed the screen, and crawled feet first into a shower stall. He hurt his ribs going through the window. Defendant told Hobson that he was "getting ready to go out the bathroom

7

door. The only thing I'm thinking of is leaving right then" when Crawford opened the bathroom door, wearing a T-shirt and underwear. He punched her, knocking her back against the wall, and kept punching her, causing her to lose consciousness. He hogtied her with a rope he had brought with him and put duct tape across her mouth. He went upstairs and got two pillowcases. Although he was wearing pantyhose over his head, he put a pillowcase over Crawford's head and tied it on so she could not identify him. He put CDs and some of Crawford's clothes in the other pillowcase. He also took a VCR, videotapes of movies, and her keys with the eight-ball keychain, which he put in his truck.

When defendant returned to the house, Crawford had regained consciousness and was struggling. He put her in his truck and went back to her house to clean up the blood. Then he drove her to the abandoned cabin, left her on a couch, drove home, and drank more whiskey. As it was starting to get light, he drove to the woodpile to chop some wood so that his landlord's daughter, Debra Wright, would see him as she went to work. After Wright left, defendant brought Crawford from the cabin to his residence. He removed some of the rope, but he left her hands tied together and kept the pillowcase and duct tape in place. He raped and sodomized Crawford on the bed, tied her feet back together, went to the kitchen for more liquor and coffee, and fell asleep on the couch. When he woke up an hour or so later, he replaced the pillowcase with a bandanna blindfold and removed the duct tape. She asked him why he was doing this, asked him to stop, pleaded with him to let her go, and cried. He did not say anything to her, and raped her over a coffee table. Leaving her hands tied and her legs untied, he clothed her in a

sweatshirt and sweatpants he had brought from her home. He put her back in his bed and went to sleep on the couch.

Defendant was awakened by a noise and saw Crawford coming out of the bedroom without the blindfold. He threw her to the floor and strangled her to death with a rope. He moved her body to the bedroom and drank more whiskey. Then he dug a grave in his yard and buried her. Defendant disposed of everything he had taken except the eight-ball keychain, a second black sweatshirt, and the CDs. He threw the VCR and videotapes, which were in a garbage bag, near a road and burned everything else.

After confessing, defendant accompanied Hobson and others to his home and the locations of the graves and the garbage bag that contained the VCR, videotapes, and CDs. The jury was shown a videotape of the trip.

### 3. *Exhumations and autopsies*

The victims' bodies were recovered the day after defendant confessed. Newhouse's body was found buried about 30 feet above the road. Crawford's body was found by defendant's residence, buried about two feet deep.

Dr. George Sterbenz, a forensic pathologist, observed the exhumations. He testified that Newhouse's body was in an advanced state of decomposition. She had on a shirt that had been cut in half up the back, and a bra with shoulder straps pulled down from her shoulders. She had on no other clothing. Two areas of her scalp were more decomposed, indicating that they had been injured, and dried fluid on top of her head was consistent with blood. Dr. Sterbenz believed the cause of death was asphyxiation, but decomposition prevented him from determining the specific mechanism by which this occurred.

Decomposition also prevented a determination of whether Newhouse suffered any trauma to the vaginal area.

Crawford's body was not as decomposed as Newhouse's body, although the level of decomposition precluded a determination of whether Crawford's vaginal or anal area was bruised. Crawford was wearing a black sweatshirt with a Hard Rock Cafe logo and black sweatpants. A blindfold made from a bandanna covered her eyes and nose. A rope circled her neck two and one-half times and was also wrapped about her torso and extremities. Two black flex ties were tied around her wrists, and a third flex tie connected them and passed through the rope. There were two lacerations inside her mouth that were consistent with a blow by a fist to the face. There was also an area of bruising on her scalp. Dr. Sterbenz concluded that her cause of death was asphyxia by ligature strangulation.

### 4. *Other corroborating evidence*

On April 23, a search of the abandoned cabin close to defendant's residence disclosed a large blood stain on the pad underneath the cushions of the couch. The next day, another search of defendant's home led to the discovery of black flex ties that matched the flex ties on Crawford's wrists. Searchers also discovered some keys about 48 feet from his home. The keys unlocked the doors to Crawford's house.

Analyses of blood stains and hair at the Jennifer Street Bridge and surrounding areas corroborated defendant's description of his abduction of Newhouse. Rodney Andrus, the assistant director at the Attorney General's laboratory in Fresno, also tested blood stains from the jump seat and the couch in the cabin. He found that their markers were consistent with Newhouse's blood and the blood stains on the bridge.

An inspection of Crawford's home further corroborated defendant's confession. Items that defendant confessed to taking were indeed missing. The state of the bed also suggested that Crawford had gotten out of bed shortly before she was abducted. Blood stains matching Crawford's were found in the bathroom.

Evidence concerning Crawford's clothes and belongings was also consistent with defendant's confession. Crawford's mother, Leslie Crawford, described some of her daughter's belongings, including an eight-ball keychain and a souvenir sweatshirt with a Hard Rock Cafe logo which she wore only infrequently. She recalled that her daughter normally wore a T-shirt and panties to bed. A search of Crawford's house failed to find the dark sweatclothes that Crawford's mother reported missing.

### 5. *Additional interviews of defendant*

After the interview on April 22, during which defendant confessed, Hobson interviewed defendant six more times. Two days after the confession, Hobson interviewed defendant to review some of the details of the crimes and his interactions with the victims. Hobson next contacted defendant the following day to discuss his childhood and upbringing. The day after that, Hobson met with defendant to talk about defendant's relatives.

On April 27, after driving defendant to view the area where he abducted Newhouse, Hobson conducted a videotaped interview, which was shown to the jury. Defendant told Hobson that Newhouse cursed at him and the more she cursed, the angrier he became. Hobson asked, "When you get mad, what do you want to do?" Defendant responded, "Rape her." He stated that after he raped her, he was no longer angry, and he denied

intentionally tying her so tightly that she would strangle herself. He confirmed, however, that he had tied her differently when she was in the truck.

In contrast to Newhouse, Crawford did not curse at defendant; he had placed duct tape over her mouth. When raping Crawford, defendant was acting out a fantasy that involved sexual pleasure and dominance. Control was part of the fantasy, and he had used plastic restraints on Crawford because they were a better means of control. He agreed with Hobson's theory that once Crawford saw defendant, "it took away the rest of the fantasy and you just knew you had to kill her." He also agreed that when he hogtied her, he was hoping that she would die like Newhouse so he would not have to kill her himself, but when she broke a thin rope he had put around her feet, he pulled on both sides of the rope around her neck and strangled her. When Hobson pointed out the inconsistency between this description and an earlier account in which defendant said he hogtied Crawford, left to drink more, and then came back and took a small piece of rope and strangled her, defendant said his current description was more accurate. He said that if Crawford had not struggled, he would have released her that night.

With respect to defendant's assertion that he had planned to release both of the victims, Hobson asked how he planned to avoid being identified as the perpetrator, given that he had not used a condom. Defendant stated that he planned to wash them in the bathtub at his home and use a bottle to wash out his semen.

Hobson asked whether defendant committed his first rape when he was 21 years old, and defendant said he committed an

attempted rape when he was 18, in Sandpoint, Idaho. The victim was a young girl. By the time he abducted Crawford, his fantasies always involved tying his victims up and cutting their clothes off. Torture had never been part of his fantasy, which involved only dominance and the ability to have sex repeatedly. He was uncomfortable when he killed Crawford; it made him feel sick and angry at himself. When he saw fliers about Newhouse or Crawford, he felt sick and sorry for them. Finally, he denied taking a camera from Crawford's house, and said he had not committed any other crimes while on parole. He also denied shooting a person in the chest in Santa Barbara over a drug deal before he went to prison. The transcript of the interview included parenthetical statements, added to inform the jury that defendant later admitted off-camera to stealing Crawford's camera and shooting a man in Santa Barbara.

Hobson met again with defendant in the last days of April, when they discussed Hobson's intention to go to Idaho and interview defendant's relatives. Then in early May, after interviewing defendant's friends and relatives, Hobson met with defendant to discuss what Hobson had learned.

### 6. *Defendant's prior sexual assault of Shelley C.*

At trial, the prosecution introduced testimony regarding defendant's prior assault of Shelley C. Shelley testified that early one morning in 1987 when she was living in San Luis Obispo County, she woke to a man's hand over her mouth. He held a knife to her throat and tied her hands behind her back. He cut off her clothes, started to gag and blindfold her, but stopped when she said she would not say anything or look. He raped and sodomized her and then hogtied her. When he heard Shelley's roommate's car, he fled. There was a strong odor of

13

alcohol on the assailant. When he was interrogated concerning this assault, defendant stated that he wanted counseling, but was afraid of the time he would spend in prison. Defendant confessed to the crimes and pleaded guilty to residential burglary, rape and sodomy.

### 7. *Defense case*

The defense offered no evidence at the guilt phase.

## B. **Evidence at the Penalty Phase**

### 1. *Defense case*

Defendant introduced extensive evidence at the penalty phase. The evidence falls into two general categories. In the first category is testimony that painted defendant as a sympathetic character, a child who was abused by a violent father and a person who, despite the abuse suffered, still had a moral compass, good personality traits, and the ability to form positive relationships. In the second category is testimony that aimed to reduce defendant's moral culpability. Defendant introduced evidence to show that he suffered from a mental illness, one that impaired his ability to control himself, and that the various institutions under which he was placed — including California's Department of Corrections — failed to afford him any treatment.

Through the testimony of his mother, sisters, grandmother, aunts, uncles, stepmother, stepsister, elementary school classmates, teacher, principal, neighbor, and others, defendant described the serious mental and physical abuse he suffered as a child. Born in 1966 to Connie Ridley and Allan Krebs, defendant was the second of four children. Allan Krebs drank, abused drugs, and beat Ridley. When she left Allan, Ridley, then an alcoholic, began living with a man who spanked

defendant, forced him to wear soiled underwear on his head, and once made defendant go to school in a diaper. Ridley eventually sent defendant back to live with his father. Allan beat defendant, once severely enough to leave "black and blue" marks and cuts from the "waistline, all the way down to his ankles."

In 1981, when defendant was 15 years old, he broke into a neighbor's home and stole a gun and some other items. As a result, defendant was sent to the North Idaho Children's Home (Children's Home), a "private, nonprofit, residential treatment facility." Defendant introduced the testimony of several staff members from the Children's Home, who described his good behavior while at the facility. Consistent with the defense presentation of defendant as a person capable of empathy for his victims and remorse for his actions, a childcare worker from the Children's Home, Scott Mosher, testified that defendant was "very remorseful" if he "did something wrong during this period of time." Toward the end of this testimony, counsel asked Mosher whether he felt defendant "should receive the death penalty." The prosecution objected, and the trial court sustained the objection, explaining that Mosher's opinion lacked relevance because Mosher last saw defendant in 1983 and no longer had any relationship with him.

When he was at the Children's Home, defendant dated an 11-year-old girl, Adonia Krug. Krug testified that defendant "helped [her] through a lot." The relationship ended amicably when Diana Scheyt, Krug's mother, told defendant how old Krug was. Scheyt thought defendant had a positive influence on her daughter and allowed the two to keep in contact as friends.

In 1984, after defendant turned 18, he assaulted a 12-year-old girl in Sandpoint, Idaho. Defendant pleaded guilty to

a misdemeanor assault charge and spent three months in the county jail for the attack.  The victim, Jennifer E., testified for the prosecution during the penalty phase, and the prosecution used this incident to cross-examine several witnesses who opined that defendant should not receive the death penalty.

During the same year, defendant was convicted of grand theft of an automobile.  For this infraction, defendant served a prison term at the North Idaho Correctional Institute at Cottonwood (Cottonwood).  Defendant presented the testimony of a Cottonwood correctional officer who recounted his generally positive attitude and good behavior while incarcerated.

Shortly after he was released from prison in 1986, defendant went to California to live with his mother and her then-husband, John Hollister.  Hollister testified that he and defendant had a friendly relationship, and that defendant had a girlfriend during this time, Liesel Turner.  According to Hollister, defendant and Turner had "[a] good relationship" and defendant was "infatuated with her, wanted to impress her."  As described *post*, the prosecution called Turner as a rebuttal witness.

In 1987, defendant was arrested and convicted of the attempted rape and rape of two women, A.C. and Shelley C. Defendant served his sentence at Soledad prison.  He introduced the testimony of three correctional officers who worked at the facility.  According to Officer Jeanne Pullano, defendant was "a model prisoner."  Pullano further testified that there was no counseling for "sexual predators" available at Soledad at that time, and even if there had been, inmates "probably would not attend because they would be identified as sex offenders if they did" and "child molesters" and "rapists" were "low . . . on the

totem pole" "within the prison population." The other correctional officers offered similar testimony.

In September 1997, defendant was paroled to San Luis Obispo County. Defendant found a job in the surrounding area, made friends, and began a relationship with a woman named Rosalynn Moore. Moore testified that defendant treated her "fairly well." In particular, defendant was never "inappropriately forceful with [her]" "in a sexual way," and if she "didn't want to do something, he would say okay and . . . that was the end of it."

Three of defendant's friends testified that they were present at a bar called Outlaws in August 1998 when defendant got into a fight with a man. One of the friends, Melissa Copeland, said that defendant had gotten into the fight because the man had threatened her and defendant "was defending [her]," "defending [her] honor."

Defendant pressed the theme of institutional failure as it pertained to his parole. For example, his counsel drew from Parole Officer Zaragoza the statements that (1) although San Luis Obispo referred all sex offenders to a "parole outpatient clinic," the program was "more monitoring" than "confidential psychotherapy," and (2) other than the parole outpatient clinic, there was no other program "available to parolees of rape convictions for their treatment." Defendant also introduced the testimony of Dr. Randall True, who worked at the parole outpatient clinic and saw defendant while he was on parole. True testified to the "limited resources" that he had to do his work. In response to the question, "if the resources were available — for a person such as [defendant] at the time you saw him — what programs would you put him in," True named a

number of treatment programs that defendant, in fact, was not afforded. True admitted, however, that defendant never told him that he had fantasies about raping women. Had defendant done so, True would have undertaken additional work.

In addition to the lay witnesses, defendant introduced the testimony of two experts, Drs. Craig Haney and Fred Berlin. Haney, a psychologist, examined defendant's background with an eye to forming an opinion concerning (1) the "opportunities in which [defendant] might have been treated for the problems from which he suffered and whether or not there was evidence that, in fact, he had been treated," and (2) the "kind of adjustment [defendant] would make . . . under a sentence of life in prison without the possibility of parole." After interviewing defendant and people who knew him, Haney came to the following conclusions. First, defendant has lived "a traumatic and traumatically damaging life." His manifestations of certain "long-lasting problems" were observed throughout his life by various people. Yet, despite the fact that "[o]ftentimes the observations were accompanied with very clear recommendations that [defendant] receive treatment," defendant "received no psychotherapy, really no psychotherapy throughout his entire life, including the ten-year period of time during which he was incarcerated in the California Department of Corrections." Second, defendant was "a person who [would] make[] a remarkably good adjustment to institutional settings," including life in prison.

The main defense expert was Dr. Berlin, a board-certified psychiatrist who interviewed defendant and "made two diagnoses with conviction." Berlin first diagnosed defendant with sexual sadism, a sexual disorder characterized by "intense, recurrent, erotically arousing fantasies and urges [that] are

about having sex in a coercive and sadistic fashion rather than in a consenting fashion." Crucially, Berlin opined that sexual sadism impaired defendant's "ability to be in full control of himself." In slightly more technical terms, Berlin said that sexual sadism caused defendant to be volitionally impaired. According to Berlin, sexual sadists, like alcoholics or heroin addicts, "on their own, often can't stop doing it [giving in to their urges] because they have an impairment in their ability to be in control." Like a kleptomaniac who is "driven to repeatedly steal," defendant was driven to engage in his behavior.

Anticipating the prosecution's argument, Dr. Berlin explained that a person suffering from volitional impairment is nonetheless able to plan and premeditate his or her actions. Berlin also explained that such a person is able to defer his or her urges. A volitionally impaired person could desist from acting out his or her urges given sufficient "external controls," for example, those controls that exist in a prison setting. This does not mean that the person has the internal controls necessary to control his or her behavior. Berlin opined that sexual sadism is a treatable disorder.

In addition to his diagnosis of sexual sadism, Dr. Berlin diagnosed defendant with alcoholism. Berlin testified that the impact of alcoholism "on sexual sadism is like pouring a fuel on the fire." The witness elaborated that "both because he was intoxicated and because he had a disorder that does impair a person's ability to be in full control of himself," defendant's capacity "to conform his conduct to the requirements of law" was "impaired." Finally, Berlin considered but did not diagnose defendant with antisocial personality disorder.

At the point in his testimony in which Dr. Berlin discussed the ability of a sexual sadist to defer his actions, defense counsel attempted to ask the witness about a law in California known as the Sexually Violent Predator Act. The prosecution objected, and after an extensive discussion with counsel, the court sustained the objection.

On cross-examination, the prosecution attacked Dr. Berlin's opinion that defendant could not control his urges. For instance, the prosecution inquired about a test known as the "policeman at the elbow," which asked whether an individual would have acted on his or her impulses if there had been a police officer present. Berlin conceded that "if the policeman had come, [defendant] would have stopped and tried not to be apprehended." However, a police officer was an external control, and once that external control was removed, Berlin did not "believe for a minute that [defendant] wouldn't have been driven to then seek out somebody else." Last, the prosecution asked Berlin what defendant did to resist the urge to kidnap Newhouse or break into Crawford's house. Berlin replied that defendant "didn't say he tried to resist." "In fact," elaborated the doctor, "he said that after these urges had come back, and he dates it to the incident in which he was in the bar fight [at Outlaws], that after fighting so hard for so many years to resist it, he kind of became demoralized and gave up and kind of stopped fighting as hard as he had previously."

### 2. *Prosecution case*

The prosecution presented three types of aggravating evidence: defendant's prior criminal activities, surviving family members' victim impact statements, and testimony to rebut defendant's mitigating evidence.

To establish defendant's prior criminal activities, the prosecution introduced evidence of his assaults on Jennifer E. and A.C. Jennifer E. testified that in 1984, when she was 12 years old, she met defendant. One night in February 1984, Jennifer was downtown with a group of friends that included defendant. At some point, defendant pulled Jennifer "off to one side" and tried to kiss her. She said, "no, I'm only 12." When she tried to walk away, defendant grabbed her, and they both fell to the ground. Defendant then attempted "to undo his pants and [her] pants." Jennifer fought to get defendant off, and defendant struck her three or four times with a closed fist. Eventually, the two rolled over an embarkment, and Jennifer was able to get away.

A.C. testified that in 1987, she lived in San Luis Obispo County. On a night in mid-June, she was in bed with her daughter when defendant broke into the house and climbed on top of her. Defendant was carrying a knife and a screwdriver. A.C.'s daughter cried and screamed. A.C. asked defendant to take her to another room. When they were walking down the hallway, defendant attempted to tie A.C. up and "got really upset" when she did not cooperate. He "hit [her] head against the wall." When A.C. tried (unsuccessfully) to stab defendant with his knife, defendant "got mad . . . and bit [her] finger." Defendant then left. A.C. later underwent surgery on her finger but could not make full use of it again.

To show the impact that defendant's crimes had on the victims' families, the prosecution introduced the testimony of Newhouse's mother and aunt and Crawford's mother and grandmother. The family members testified about the victims' lives and plans they had for the future. They also described the devastation brought by the victims' deaths.

Finally, the prosecution produced rebuttal testimony. It called Liesel Turner, who was defendant's girlfriend in 1987. Turner testified that she ended the relationship with defendant because she did not "feel safe" and gave reasons for her feelings.

In addition, the prosecution rebutted Dr. Berlin's testimony with the testimony of Dr. Park Dietz. Unlike Berlin, Dietz testified that individuals "whose only problem is sexual sadism" did not suffer from volitional impairment. Dietz nonetheless afforded a role to mental illness, opining "the reason [defendant] behaves in this way toward victims is because he has an antisocial personality disorder." Finally, Dietz rested his conclusion that defendant did not suffer volitional impairment on the particular facts of the case. Specifically, Dietz testified that defendant's decisions to drink, lie to his doctor, "cruise" for victims, carry a "rape kit," and stop resisting his impulses showed that his "volitional control was there." When asked "whether at the time of the offense the capacity of the defendant . . . to conform his conduct to the requirements of the law was impaired as a result of a mental disease or defect," Dietz's answer was that defendant's "decision to stop resisting, to stop trying to conform his conduct, is a choice, a bad choice, he made, rather than his not having the ability to control himself."

## II. DISCUSSION

### A. Jury Selection Issues

Defendant claims that the prosecutor improperly used his peremptory challenges to remove Catholic prospective jurors in violation of *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *People v. Batson* (1986) 476 U.S. 79 (*Batson*). Although defendant argued before the trial court that the prosecution wrongfully removed six prospective jurors on the basis of their

religious affiliation, Catholicism, defendant's *Batson*/*Wheeler* claim on appeal is restricted to the removal of a single prospective juror, Juror No. 6.[5] For the reasons explained below, we reject his claim.

### 1. Background

Prospective Juror No. 6, along with more than 150 other venire members, filled out a written questionnaire and was individually questioned by the court and counsel. Jurors who were not excused during the individual questioning were asked to return some days later. Upon their return, the remaining jurors were subject to peremptory challenges by the prosecution and defense — each of which had 20 such challenges. In quick succession, the parties struck 25 jurors, with the prosecution striking Juror No. 6 as his eighth strike. After the prosecution also struck Juror Nos. 122 and 126, the defense raised a *Batson*/*Wheeler* challenge, arguing that the prosecution had improperly removed these three jurors because they were Catholic.[6] Defense counsel acknowledged that defendant was

---

[5] *Batson* has been held to preclude the removal of a potential juror based solely on the venire member's religious affiliation. (*U.S. v. Brown* (2d Cir. 2003) 352 F.3d 654, 667-669; see *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158 (*Gutierrez*) ["At issue in a *Batson*/*Wheeler* motion is whether any specific prospective juror is challenged on account of bias against an identifiable group distinguished on racial, religious, ethnic, or similar grounds"].) The Attorney General does not contend otherwise.

[6] Defense counsel also mentioned Prospective Juror No. 49 but admitted that "the record is a little more ambiguous" about whether he was Catholic. The trial court did not inquire about this juror much thereafter, and we infer that the court determined Juror No. 49 was not Catholic.

not Catholic but stressed that he "has received religious counseling from a Catholic nun."

Before asking the prosecution to give its reasons for striking the three jurors, the court made the following statement. "[T]here's some question as to whether — in the case law the record assumes that the finding has been made of a reasonable inference if you ask for justification from the other party. And on this record I don't think I can make a finding that there's a reasonable inference although there does seem to be at least the beginnings of a trend. [¶] But with three jurors — I know there are a lot of Catholics on this panel, just in my memory. I don't know which numbers they are, but I know there are a lot." The court then stated, "with that caveat, I'll ask the prosecutor to state what his reasons were for those three jurors."

The prosecutor offered his reasons for excusing the venire members. With regard to Prospective Juror No. 6, the prosecutor stated that he was concerned with the juror's stance on "psychiatric issues." Citing questions from the written questionnaire, the prosecutor described the juror's answers as revealing that she "puts faith in psychiatric testing, thinks psychology and psychiatry is very useful, and believes it can explain a lot about a person."[7] These responses concerned the

---

[7] The questions and answers from the written questionnaire the prosecutor referred to are as follows:

"Q111.     Are you familiar with psychological testing?

"A.          [Juror circled "Yes."]

"Q.          Which tests?

"A.          Not sure.

prosecution because "the defense has hired one of the top psychologists in the country, Dr. Fred Berlin."

The prosecutor also cited Prospective Juror No. 6's response to Question No. 129 on the questionnaire. This question asks, "Is there any type of information regarding a defendant's background or character that would be important to you when choosing between life without parole and death (e.g. work record, childhood abuse, brutal parents, alcoholism, former good deeds, illnesses, etc.)?" In response, the juror wrote, "childhood abuse, brutal parents, alcoholism, illnesses." The

"Q.        How do you feel about these tests?

"A.        It determines what is the true feelings of that person."

"Q113.    What is your opinion about the use of psychology or psychiatry to explain human behavior?

"A.        I think it[']s very useful."

"Q114.    Have you ever studied psychiatry, psychology, or any related subjects?

"A.        [Juror circled "No."]

"Q.        Do you have an interest in the psychology of the mind?

"A.        I'm curious to know.

"Q.        Have you read articles or watched information and/or entertainment programs relating to this subject?

"A.        Yes.

"Q.        What are your general opinions about this subject?

"A.        I think it can explain a lot about a person."

prosecution noted that childhood abuse, brutal parents, and alcoholism were things "we know will be offered in this case" as mitigating factors at the penalty phase.

The court made its ruling after hearing the prosecution's reasons and the defense's response. Directing its comments at the prosecutor, the court stated, "Actually went a lot further than you needed to, but on the basis of this record, I can't find a reasonable inference, as I indicated earlier, based on just three jurors. My feeling was there were probably about 20 [Catholic prospective jurors] in the field of 83. Ms. Ashbaugh's [one of defendant's attorneys] indicating that there are 18. [¶] But in any event, it appears that there certainly are secular reasons for excusing each of the jurors, and it clearly — in the process that we've gone through, the record obviously reflects that the questionnaire is replete with questions that would give you information for preempts on both sides. . . . [¶] But, as I say, in this case I don't at this point even find a reasonable inference. I only asked for the response just for the record." The court denied defendant's *Batson*/*Wheeler* motion.

The defense renewed its motion upon dismissals of more prospective jurors, and the court deferred discussion until jury selection had finished. Once both parties had exhausted their peremptory challenges, the defense contested the prosecution's excusal of Prospective Juror Nos. 127, 201, and 141. Juror No. 141 was the prosecution's last challenge; the prosecution had previously accepted a panel with Juror No. 141 on the panel, but after the defense struck another juror, the prosecution exercised its two remaining peremptory challenges to strike more jurors, including Juror No. 141. The court heard the parties' arguments regarding the strikes and once again denied the *Batson*/*Wheeler* motion. In so ruling, the court stated, "I don't find a reasonable

inference of a group bias, but I did get reasons on the record from the prosecutor as to why the excusals were made. . . . [¶] And the fact that there are . . . two jurors still on the panel who are Catholics is of some weight, except that all the challenges have been exhausted."

Despite the objections raised to the excusals of multiple panelists during jury selection, defendant, as noted earlier, now challenges the trial court's ruling only with respect to Prospective Juror No. 6. Because "reviewing courts must consider all evidence bearing on the trial court's factual finding regarding discriminatory intent," we bear the above record in mind as we examine defendant's *Batson*/*Wheeler* arguments with regard to this single juror. (*People v. Lenix* (2008) 44 Cal.4th 602, 607 (*Lenix*).)

### 2. *Analysis*

The framework for analyzing a *Batson/Wheeler* challenge is well established. The analysis proceeds in three stages. "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on [religious affiliation]. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a [group]-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination." (*Lenix*, *supra*, 44 Cal.4th at p. 612.)

A preliminary question is whether defendant's *Batson*/*Wheeler* challenge here should be reviewed at the first or third stage. Defendant presses that we should conduct a third-stage inquiry. The Attorney General concedes the point, but her brief was filed before we decided *People v. Scott* (2015) 61

Cal.4th 363, 391 (*Scott*). In *Scott*, we acknowledged that our jurisprudence in distinguishing between a first- and a third-stage review "has not always been entirely consistent." (*Id.* at p. 386.) We sought to rectify the inconsistency by clarifying that "where (1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror for the record, (3) the prosecutor provides nondiscriminatory reasons, and (4) the trial court determines that the prosecutor's nondiscriminatory reasons are genuine, an appellate court should begin its analysis of the trial court's denial of the *Batson/Wheeler* motion with a review of the first-stage ruling." (*Id.* at p. 391.) Accordingly, if the trial court makes a first-stage ruling before the prosecutor states his or her reasons for excusing the prospective jurors, an appellate court reviews that first-stage ruling. In contrast, when the trial court listens to the prosecutor's reasons before purporting to rule on the first stage inquiry, "we infer an 'implied prima facie finding' of discrimination and proceed directly to review of the ultimate question of purposeful discrimination." (*Id.* at p. 387, fn. 1.)

The trial court here found that defendant did not make out a prima facie case of discrimination. This was what the court meant when it said it did not find a "reasonable inference." But of course, the court said it could not make "a reasonable inference" twice, once before inviting the prosecutor to offer his reasons and once after hearing those reasons. If the court's first statement — "on this record I don't think I can make a finding that there's a reasonable inference" — constitutes a ruling, then we should review that first-stage ruling. On the other hand, if the court did not make a ruling until after it heard the prosecutor's reasons — when it stated more definitively that "on

the basis of this record, I can't find a reasonable inference" — then we should treat the prima facie case as moot and "instead skip to *Batson*'s third stage." (*People v. Mills* (2010) 48 Cal.4th 158, 174.) The record is susceptible of both readings, but the ambiguity proves immaterial in this case. Even were we to assume — as defendant urges — that his challenge has arrived at the third stage, still we would find against him.

"At the third stage of the *Wheeler*/*Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's [group]-neutral explanations to be credible.'" (*Lenix*, *supra*, 44 Cal.4th at p. 613.) "Review of a trial court's denial of a *Wheeler*/*Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. . . . 'So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.'" (*Id.* at pp. 613-614.) Defendant urges us not to accord deference to the trial court's decision because, in his view, the court did not make a "sincere and reasoned effort" to evaluate the prosecutor's reasons. In particular, defendant faults the court for not evaluating "any of the actual reasons given by the prosecutor" and instead speaking only in the hypothetical, stating that "the questionnaire is replete with questions that *would* give you information for preempts."

Contrary to defendant's assertion, the trial court's statements indicate it did generally evaluate the prosecutor's proffered reasons — responses on the written questionnaire — for excusing the prospective jurors. As the trial court observed, "it appears that there certainly are secular reasons for excusing each of the jurors, and it clearly — in the process that we've gone through, the record obviously reflects that the questionnaire is

replete with questions that would give you information for preempts on both sides." Defendant makes much of the fact that the court used the conditional tense, i.e., that it stated the questionnaire "*would* give you information for preempts on both sides" and not that the questionnaire *did* supply information to strike the jurors. But the court's phrasing is understandable in light of the fact that it ruled against defendant at the first stage and made a third-stage finding only were it, counterfactually, to reach the matter.

In any event, we find substantial evidence to support the trial court's denial of defendant's *Batson/Wheeler* challenge. The prosecutor's reasons for striking Prospective Juror No. 6 are plausible and supported. The prosecution expected defendant to argue — partly through the use of psychiatric testimony — that he did not deserve the death penalty because he suffered childhood abuse, alcoholism, and mental illnesses. Juror No. 6 indicated that she was receptive to such arguments. It was therefore sound trial strategy for the prosecution to have struck her. (See, e.g., *Gutierrez, supra*, 2 Cal.5th at p. 1168; see also *People v. Cunningham* (2015) 61 Cal.4th 609, 665 [crediting a prospective juror's receptivity to psychological testimony as a race-neutral reason for the prosecutor to have struck her when the defense was expected to rely heavily on such testimony]; *People v. Watson* (2008) 43 Cal.4th 652, 676-678 [finding no *Batson/Wheeler* error when a juror was struck because she may have been "overly sympathetic" to the defendant's evidence "of abuse and neglect during his childhood"].)

Defendant argues that the prosecution had no genuine reason to want to strike a prospective juror who was receptive to psychiatry. Defendant contends that a juror's attitude to psychiatry was a neutral factor, as a psychiatrist was also

expected to testify for the prosecution. But the prosecution could have judged that a juror not so inclined to believe in psychiatric testimony altogether might be better for its case. However correct was its judgment, we see little to suggest that it exercised its peremptory challenge improperly. (See, e.g., *Gutierrez*, *supra*, 2 Cal.5th at p. 1171.)

Defendant also argues that the prosecution should not have relied on Prospective Juror No. 6's response to Question No. 129 because the question was asked in a leading manner. Yet, simply because the juror may not have focused on "childhood abuse, brutal parents, alcoholism, [and] illnesses" until prompted by the question does not mean her response was unreliable. There is nothing to indicate that the prosecution behaved disingenuously in reading the juror's answer as indicating that she was sympathetic to defendant's case in mitigation.

Other evidence supports the conclusion that the prosecutor's reasons for striking Prospective Juror No. 6 were genuinely held. (See, e.g., *People v. Hardy* (2018) 5 Cal.5th 56, 76.) First, we have the prosecution's oral examination of the juror. Far from being desultory, the prosecutor during voir dire explored the same topics from the questionnaire that ultimately motivated him to excuse the juror. For example, the prosecutor asked Juror No. 6 about her "curios[ity] about the criminal mind," and she responded that she wanted an explanation for why criminals do what they do and that "childhood abuse or brutal parents or alcoholism" could be an explanation for why

people commit crimes.[8]  The juror also confirmed that she wanted to know about "abuse or alcoholism, or illness" before deciding on the penalty.  The fact that the prosecutor took the time to ask Juror No. 6 about areas that concerned him suggests that he was not using her written answers as a pretext for excluding her.

Second, we note that two Catholic jurors sat on the jury. Of course, the presence of Catholic jurors on the jury is "not conclusive" to our inquiry, because the "[e]xclusion of even one prospective juror for reasons impermissible under *Batson* and *Wheeler* constitutes structural error" regardless of how many other venire members were not so erroneously excluded. (*People v. Turner* (1994) 8 Cal.4th 137, 168; *Gutierrez, supra,* 2 Cal.5th at p. 1158; see also *People v. Motton* (1985) 39 Cal.3d 596, 607-608; *People v. Snow* (1987) 44 Cal.3d 216, 225.)  Nonetheless, a prosecutor's acceptance of a jury with members of a group that the prosecutor allegedly discriminated against "strongly suggests that [bias] was not a motive in his challenge" and, as such, is "an appropriate factor . . . to consider" in the *Batson*/*Wheeler* analysis.  (*Lenix, supra,* 44 Cal.4th at p. 629; *Turner, supra,* 8 Cal.4th at p. 168; see also *People v. Blacksher* (2011) 52 Cal.4th 769, 802; *People v. Jones* (2011) 51 Cal.4th 346, 362-363 (*Jones*);  *People v. Kelly* (2007) 42 Cal.4th 763, 780.) The trial court did not give this circumstance much weight because it thought that the prosecution had run out of

---

[8]    The prospective juror went so far as to state that none of the people she knew who had been abused as children grew up "normal," as they either "abused their kids or . . . follow[] through with how they were raised."  "In a way," she said, "it seems like they can't help it because that's the way they were raised, but it's not an excuse."

peremptory challenges and thus had to accept the jury. This was incorrect. Prior to exhausting its peremptory challenges, the prosecution had accepted the jury with three Catholics on the panel. It was only after the defense struck one more juror that the prosecution exercised its two remaining challenges and excused another Catholic prospective juror (Prospective Juror No. 141). The fact that the prosecution accepted a panel with three Catholic jurors on it when it could have winnowed the number to one is another piece of evidence suggesting that the prosecutor did not harbor group bias against Catholics.

Against the substantial evidence supporting the trial court's decision, defendant urges us to undertake a comparative juror analysis. According to defendant, a comparison of Prospective Juror No. 6's answers against those of seated jurors shows that the prosecutor's reasons for excusing Juror No. 6 were pretextual, as many jurors gave answers similar to those of Juror No. 6 but the prosecution did not strike them. Having examined the record ourselves, we do not agree that the seated jurors were comparable to Juror No. 6.

"Comparative juror analysis is evidence that, while subject to inherent limitations, must be considered when reviewing claims of error at *Wheeler/Batson*'s third stage when the defendant relies on such evidence and the record is adequate to permit the comparisons. In those circumstances, comparative juror analysis must be performed on appeal even when such an analysis was not conducted below." (*Lenix, supra*, 44 Cal.4th at p. 607.) Because defendant did not attempt such a comparison during trial, "the prosecutor was not given the opportunity to explain his reasons for dismissing [the challenged jurors] while later retaining [the seated jurors]." (*People v. O'Malley* (2016) 62 Cal.4th 944, 977.) Under such circumstances, we " 'must not

turn a blind eye to reasons the record discloses for not challenging other jurors even if those other jurors are similar in some respects to excused jurors.'" (*Ibid.*; see *Jones, supra*, 51 Cal.4th at pp. 365-366.) Hence, to determine whether the seated jurors were truly comparable to the challenged juror, we may look at more than just the specific questions from the questionnaire that the prosecutor cited in explaining his decision to strike Prospective Juror No. 6. (*O'Malley, supra*, 62 Cal.4th at p. 977; *Jones, supra*, 51 Cal.4th at p. 365 [rejecting the defendant's argument that the court "may not consider reasons not stated on the record for accepting *other* jurors"].) Defendant is wrong to suggest otherwise and did not respond to the Attorney General's extensive showing that the unexcused jurors were, in many respects, more favorable to the prosecution than Juror No. 6.

Furthermore, the sworn jurors did not give substantially the same answers as Prospective Juror No. 6 on the specific questions mentioned by the prosecutor. Defendant strings together a number of jurors whose answers were somewhat similar to Juror No. 6's on *either* the questions about psychiatric attitude (Question Nos. 112 and 113 in particular) *or* the question about the important factors in deciding on penalty (Question No. 129). However, just three of those jurors gave purportedly similar answers to Juror No. 6 on both sets of questions. Other jurors gave answers similar to those of Juror No. 6 on only one of the two areas. These jurors are thus not comparable to Juror No. 6 at the outset. (See *Lenix, supra*, 44 Cal.4th at p. 624 ["Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable."]; *id.* at p. 631

["Advocates do not evaluate panelists based on a single answer. Likewise, reviewing courts should not do so."].)

The answers of the remaining three jurors do little to strengthen defendant's case. Of these jurors, none said — as Prospective Juror No. 6 did — that psychological testing "determines what is the true feelings of [a] person." Unlike Juror No. 6, they also did not say that psychology or psychiatry is "very helpful" "to explain human behavior." Instead, when asked for an opinion on "the use of psychology or psychiatry to explain [such] behavior," Juror No. 253 simply said, "I do not know what other field deals with human behavior"; Juror No. 334 gave the circumspect answer of, "It could be reasonable depending on how it is presented"; and Juror No. 338 answered somewhat ambivalently, "Perhaps to explain the motivational factors behind the crime. Also, to permit introduction of mitigating/extenuating circumstances." Moreover, these seated jurors did not identify specific factors that were important to them at the penalty phase. Juror Nos. 253 and 338 simply said, "yes" when asked if there is "any type of information regarding a defendant's background or character that would be important to you when choosing between life without parole and death." Juror No. 334 gave the even weaker answer of, "Depend on the evidence." None of the three jurors singled out "childhood abuse, brutal parents, alcoholism, illnesses" as did Juror No. 6.

The comparative juror analysis, in short, does not persuade us that it is more likely than not that the prosecution's reasons for excusing Prospective Juror No. 6 were pretextual. Defendant's other arguments fare no better, and we affirm the trial court's denial of defendant's *Batson/Wheeler* challenge.

## B. Guilt Phase Issues

### 1. *Admission of defendant's confession*

Defendant contends his confession on April 22, 1999 and all subsequent statements should have been excluded because his invocation of the right against self-incrimination on April 21 was not honored and his waiver under *Miranda, supra*, 384 U.S. 436 was involuntary. As explained below, we agree that the investigator should have stopped the interrogation on April 21 sooner than he did but disagree that the failure compels the exclusion of the confession obtained on April 22 or thereafter. We therefore reject defendant's claim that the court erred in admitting his statements.

### a. *Background*

Before trial began, defendant filed a motion to suppress his April 22 confession and all following statements. At the hearing on the motion to suppress, Hobson testified. Hobson stated that he met with defendant for the first time in March 1999, after defendant had been arrested for violating his parole. At that time, defendant was one of 13 to 16 individuals who, because of their prior commission of sexual offenses, were being questioned regarding the disappearance of the two victims. Without giving defendant the warnings required by *Miranda*, Hobson interviewed him for an hour or so. Defendant told Hobson that he knew he would be questioned about the disappearance of the two women, and he was willing to cooperate in the investigation because he was confident the investigation would establish his innocence. He also told Hobson the police could search his vehicles and his house at any time, and that he was willing to answer questions that arose in the future.

In early April 1999, Hobson met again with defendant at the San Luis Obispo Police Department. Hobson asked defendant to submit to a polygraph examination, and defendant eventually agreed. The polygraph examiner advised defendant, both orally and in writing, of his *Miranda* rights, and defendant signed a statement waiving those rights. Defendant began the polygraph examination, but terminated it before the examination was completed.

After the polygraph examination ended, Hobson again talked to defendant. Hobson asked defendant if he remembered the *Miranda* rights that the polygraph examiner had read him. Defendant indicated that he remembered them and stated that he was willing to talk to Hobson. During the 30- to 40-minute interview that followed, Hobson asked him again where he was on various dates. Defendant readily answered questions and reiterated that he was confident that the investigation would clear him of any involvement in the two cases.

On April 21, 1999, Hobson met defendant at the jail and asked if he was still willing to talk and cooperate with the investigation. Defendant said he was. Hobson transported defendant to the police department, where the subsequent questioning was recorded. At the beginning of the interview, Hobson asked defendant if he still knew the rights the polygraph examiner had read him. Defendant confirmed that he knew those rights, and Hobson stated, "those are the rights that still apply here."

Defendant was initially cooperative. However, once Hobson began confronting him with physical evidence connecting him to the crimes — the eight-ball keychain found in defendant's possession that resembled Crawford's and the blood

found on defendant's jump seat that matched Newhouse's —
defendant lapsed into silence. During the next 15 or 16 minutes,
defendant remained silent while Hobson urged him to give an
account of what happened. Defendant eventually stated, "Put
me down in a holding cell and let me think, all right?" When
Hobson did not honor the request, defendant said that if Hobson
"sit[s] there and tr[ies] [to] keep beating on [him]," he was "not
gonna say nothing." After some more back-and-forth, Hobson
agreed to give defendant a 10-minute break and left.

Hobson returned approximately five minutes later, telling
defendant, "we know you did it . . . . What matters is why you
did it." In response, defendant whispered, "Take me back to
jail." Hobson asked if defendant did not want to help him, and
defendant confirmed, "Not right now." Hobson continued
talking, and defendant said, "Nothing to say Larry."

Hobson then spoke some more. Defendant indicated for
the second time that he had "[n]othing to say." At this point,
Hobson agreed to take defendant back to jail, saying that
defendant should call him when he was ready to talk. Hobson
then stated, "I'll take you back out just like I brought you in.
You're on a parole hold,"[9] and defendant responded, "I'm on
parole hold forever."

As Hobson and defendant were leaving to return to the
jail, defendant asked Hobson for a cigarette and for him to drive
around a while so defendant could smoke. During the ride,
Hobson asked defendant more questions. For instance, when he

---

[9] The transcript included the parenthetical "(Meaning he
was not being arrested for the murders of Rachel and Aundria)"
following Hobson's statement that defendant was "on a parole
hold."

heard defendant in the back seat crying and mumbling to himself, Hobson asked what defendant was thinking. When they arrived at the entrance to the jail facility, Hobson asked defendant whether he was willing to take him to the victims. Defendant told Hobson to turn into the facility instead, and Hobson complied. As they were walking to the jail, Hobson also asked if, in the event Hobson did not hear back from defendant, he would be willing to let Hobson return the next day. Defendant responded, " "Maybe I'll deal with it tomorrow.' " Their conversation ended at approximately 2:00 or 2:30 p.m.

At approximately 9:45 a.m. on April 22, Hobson arrived uninvited back at the jail facility. He met with defendant in an employee break room, and had defendant brought to him without handcuffs or other restraints. Hobson testified at the suppression hearing that he chose the break room instead of the police department because he "wanted it to be a noncustodial-type situation," where defendant would not "feel any type of coercion." Once defendant arrived, Hobson began talking, observing that the situation with the disappearance of the two victims was not going to go away. Hobson stated that the investigation painted a terrible picture, and he wanted to hear defendant's side of the story, which might be different. Defendant told Hobson that Hobson was wrong, that "I'm nothing but an animal, and I don't deserve to live." Defendant also mumbled, "Nothing can justify what I did." The first statement ("I'm nothing but an animal, and I don't deserve to live") came within five minutes of Hobson initiating conversation with defendant, and the second ("Nothing can justify what I did") followed shortly thereafter.

When Hobson returned to topics he had broached previously, defendant asked Hobson what he wanted defendant

to tell him. Hobson said he wanted the truth. Defendant responded, "Okay. But I don't want to talk here." Hobson agreed to take him to the police department.

Before transporting defendant from the jail, Hobson informed defendant that he "wanted to make sure [defendant] understood exactly what we were going to be doing and the questions I was going to be asking . . . so we didn't spend another two hours of wasted time." Hobson then read defendant his *Miranda* rights, and defendant acknowledged that he understood them. Hobson asked defendant if he was responsible for the disappearance and deaths of the two victims, and defendant said he was. Hobson subsequently arranged for defendant to be transported to the San Luis Obispo Police Department. The interaction at the jail took "a total of 30 minutes from the time [Hobson] walked in until the time [he] left."

Upon arriving at the police department, Hobson advised defendant of his *Miranda* rights for the second time that day and asked if he understood them. Defendant answered in the affirmative. He then provided a detailed confession to the crimes as described *ante*, part I.A.2.

Hobson followed the same advisement procedure when he interviewed defendant on April 27. During this interrogation, Hobson asked defendant if he had "always talked to [Hobson] voluntarily." Defendant agreed that he had. Although the interview was primarily devoted to obtaining more details about the kidnappings and killings of Newhouse and Crawford, Hobson also asked defendant toward the end of the interrogation what prompted him to confess. Defendant responded, "[c]ause what I did was wrong." When asked if

anything Hobson told him "convinced [him] that [he] should talk," defendant responded, "[b]lood on my car seat." Defendant distinguished between the two pieces of physical evidence the police had at that time, the eight-ball keychain and the blood. With regard to the blood, defendant said he "knew what was there" and so knew that the police were not "bluffing." He confirmed that if all Hobson had was the keychain, he would not have confessed.

After listening to Hobson's testimony and reviewing the taped confessions, the trial court denied defendant's motion to suppress. In its order, the trial court noted that defendant had first been advised of his *Miranda* rights on April 1 and had agreed to discuss the case with Hobson. It further noted that on April 21, defendant said he recalled his rights. The court found that on April 21 "defendant had invoked his right to remain silent" but did not resolve when exactly he did so. The court further reasoned that Hobson "stumbled in his attempt to honor" defendant's invocation when Hobson asked defendant at the end of the drive to take Hobson to the victims. However, the court concluded that Hobson's inappropriate "contact was terminated at the jail in late afternoon at approximately 4:00 p.m" when Hobson dropped defendant off. Furthermore, "[d]efendant at that time indicated that he might be willing to speak with Hobson the next day: 'Maybe. I'll deal with it tomorrow.' "[10] Based on these facts, the court concluded that

_____

[10] The trial court's order includes a period after "Maybe." The court reporter transcribed Hobson's testimony as stating, "Maybe I'll deal with that tomorrow." Moreover, Hobson testified that their conversation on April 21 ended at approximately 2:00 or 2:30 p.m., rather than at 4:00 p.m. as the

41

defendant's "request to cease questioning then was honored within the meaning of federal law."

Turning to the events of April 22, the trial court rejected the Attorney General's argument that defendant was not in custody when Hobson approached him that morning. Although defendant's jailed status "was due to parole violations," the court found that a reasonable person would believe he was in custody "on the case in question." As such, defendant was in custody for *Miranda* purposes and "should have been advised of his *Miranda* rights or at least reminded of them by Investigator Hobson." Because Hobson failed to do so, the court excluded defendant's inculpatory statements that were made before Hobson read defendant his *Miranda* rights, i.e., the statements "I'm nothing but an animal. I don't deserve to live" and "Nothing can justify what I did." The court nonetheless concluded that these admissions were voluntary.

Finally, the trial court found all statements taken after Hobson gave defendant his *Miranda* warnings on April 22 were admissible. It reasoned that Hobson had "obtained implied waivers," and "[t]here is no evidence that defendant's will was overcome." We review these findings below.

### b. *Analysis*

We begin with the uncontroverted premise that statements made by a defendant subject to custodial interrogation are inadmissible (for certain purposes) unless the defendant was "warned that he has a right to remain silent, that

---

trial court's order stated. The Attorney General's brief quotes the reporter's transcript, with no period after "maybe," and recites that Hobson dropped defendant off at the jail at about 2:00 or 2:30 p.m.

any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Miranda, supra,* 384 U.S. at p. 444; see *Harris v. New York* (1971) 401 U.S. 222, 224.) "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." (*Miranda, supra,* 384 U.S. at p. 444.)

"On appeal, we review independently the trial court's legal determinations of whether a defendant's . . . *Miranda* waivers were knowingly, intelligently, and voluntarily made [citation], and whether his later actions constituted an invocation of his right to silence [citation]. We evaluate the trial court's factual findings regarding the circumstances surrounding the defendant's statements and waivers, and " ' "accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence." ' " (*People v. Rundle* (2008) 43 Cal.4th 76, 115 (*Rundle*).)

Independent of whether a defendant's rights under *Miranda* were observed, his or her statements may not be admitted unless they were voluntary. "The court in making a voluntariness determination 'examines "whether a defendant's will was overborne" by the circumstances surrounding the giving of a confession.' " (*Rundle, supra,* 43 Cal.4th at p. 114.) The prosecution bears the burden of proof and must show "by a preponderance of the evidence the statements were, in fact, voluntary." (*Ibid.*)

### i. Custody status

As a threshold matter, the Attorney General argues that defendant was not in custody when he confessed and so *Miranda*

has no application. (*People v. Stansbury* (1995) 9 Cal.4th 824, 833 [" '*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody" ' "].) The Attorney General acknowledges that defendant was under arrest and held in county jail when Hobson questioned him, but maintains that such restriction on defendant's freedom related only to his parole violations. As such, he was not in custody "for *Miranda* purposes as to the Newhouse/Crawford cases at the time he confessed to the crimes." The trial court rejected this argument, and so do we.

We recognize that a formal arrest does not always constitute custody for *Miranda* purposes. (See *Maryland v. Shatzer* (2010) 559 U.S. 98, 112 (*Shatzer*); *Howes v. Fields* (2012) 565 U.S. 499, 509 (*Howes*).) In *Shatzer*, *supra*, 559 U.S. at page 112, the high court explained that such an arrest or the equivalent restraint in freedom of movement is "only a necessary and not a sufficient condition for *Miranda* custody." In particular, an incarcerated person who is interrogated by the police is not necessarily in *Miranda* custody. This is because such a person is not always exposed to "the coercive pressures identified in *Miranda*." (*Id.* at p. 113; see also *Howes*, *supra*, 565 U.S. at pp. 508-509 [" 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion"].)

The high court returned to the same theme in *Howes*. The court began by identifying "three strong grounds" why an incarcerated person may not experience the coercive pressure of *Miranda* custody. (*Howes*, *supra*, 565 U.S. at p. 511.) "First, questioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest." (*Ibid.*) "Second, a prisoner, unlike a person who has not

44

been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release." (*Ibid.*) "Third, a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence." (*Id.* at p. 512.) Reviewing the facts of the case before it, the court concluded that the prisoner "was not in custody within the meaning of *Miranda.*" (*Id.* at p. 517.) In coming to this conclusion, the court took "into account all of the circumstances of the questioning" but thought the "[m]ost important" factor was that the prisoner had been "told at the outset of the interrogation, and reminded thereafter, that he could leave and go back to his cell whenever he wanted." (*Id.* at pp. 517, 515.)

This case is different from *Shatzer* or *Howes.* In those cases, a person serving a prison sentence was brought in for questioning on an unrelated crime. By contrast, here defendant was not serving a term of incarceration when he was questioned, and it is difficult to separate his jailed status from the investigation into the Newhouse and Crawford murders. Although the legal justification for defendant's detention was a parole violation, the impetus for the arrest was the perceived similarity between defendant's prior crimes and Crawford's disappearance. Moreover, defendant's interactions with law enforcement after his arrest all concerned the Newhouse and Crawford investigation. At the time of his confession on April 22, defendant had been repeatedly questioned about the disappearance of these two women. With good reason then, defendant appeared to have understood that his custodial status, although technically a parole hold, was connected to the Newhouse and Crawford matters. This explains defendant's

uncontradicted statement that he was going to be on parole hold "forever," something that seems unlikely were defendant held only for drinking alcohol and possessing something that looked like a firearm.

All this matters because, in such circumstances, the rationales given in *Howes* concerning why a person would not necessarily feel the coercive pressure of interrogation fall away. Unlike the defendant in *Howes*, defendant was recently arrested and presumably still experiencing "the shock that very often accompanies arrest." (*Howes*, *supra*, 565 U.S. at p. 511.) He likely hoped for "prompt release" and so might have been lured into speaking. (*Ibid.*) Finally, he might well have thought that Hobson had "the authority to affect the duration" of his parole hold. (*Id.* at p. 512.) Because law enforcement interest in defendant appeared to have been motivated by the disappearance of the two women, defendant might reasonably have thought that if he could convince Hobson he was not responsible for what happened to Newhouse and Crawford, he might be released. This explains defendant's willingness to cooperate with the police — including by voluntarily answering questions, giving law enforcement permission to search his property, and undergoing a polygraph examination.

Moreover, we find that defendant was, in fact, subject to the coercive pressure associated with interrogation. At no point was defendant told that he "could leave and go back to his cell [at the county jail] whenever he wanted." (*Howes*, *supra*, 565 U.S. at p. 515.) Indeed, when defendant asked to be taken back to jail on April 21, Hobson took some time to accede to the request. Hobson also used the time in the interim to try to elicit incriminating responses from defendant — that is, to subject him to interrogation. (See *Rhode Island v. Innis* (1980) 446 U.S.

291, 300-301; *Shatzer, supra,* 559 U.S. at p. 112 [reasoning that "the coercive pressure that *Miranda* was designed to guard against" was the " 'danger of coercion [that] results from the interaction of custody and official interrogation' ", italics omitted].) Considering the circumstances surrounding defendant's interrogation, we cannot say that a reasonable person in his position " 'would have felt free to terminate the interview and leave.' " (*Howes, supra,* 565 U.S. at p. 515.) We therefore find that defendant was in custody for *Miranda* purposes when he confessed.

### ii. Waiver and confession

We now address the merits of defendant's claim that his confession should have been suppressed. Because defendant seeks to suppress the statements that he gave on April 22 and thereafter, we begin with the circumstances most immediately surrounding these statements. The statements — detailed, recorded admissions of how defendant kidnapped, raped, and murdered Newhouse and Crawford — were taken after Hobson advised defendant of his *Miranda* rights and confirmed that he understood them. As long as defendant validly waived the *Miranda* protection and voluntarily confessed, the statements are admissible. (See *Missouri v. Seibert* (2004) 542 U.S. 600, 608-609 (*Seibert*) ["giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver"].)

A valid waiver need not be express, but "may be implied from the defendant's words and actions." (*People v. Parker*

(2017) 2 Cal.5th 1184, 1216 (*Parker*).)  When a suspect " 'having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them.' " (*Id.* at p. 1216.)

There is no question that defendant "heard and understood a full explanation" of his rights.  (*Parker*, *supra*, 2 Cal.5th at p. 1216.)  On April 22, Hobson twice read defendant his rights, and defendant expressly stated that he understood them.  Moreover, defendant "had extensive prior experience with the criminal justice system," having been convicted of numerous felonies before being interrogated in this case.  (*Ibid.*)  Such familiarity bolsters the conclusion that defendant had "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  (*Moran v. Burbine* (1986) 475 U.S. 412, 421; see also *Parker*, *supra*, 2 Cal.5th at p. 1216 [crediting such prior experience with the criminal justice system].)

Likewise, there is no dispute that defendant spoke to Hobson — and so "act[ed] in a manner inconsistent" with the exercise of his *Miranda* rights.  (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 385 (*Berghuis*).)  After being apprised of his rights, defendant "proceeded to actively participate in the conversation with the detective[] — answering questions, asking for clarification, and generally contributing to a discussion he knew was being tape-recorded." (*Parker*, *supra*, 2 Cal.5th at p. 1216.)  He did not once mention an attorney.  Such conduct suggests that defendant "has made a deliberate choice to relinquish the protection those rights afford." (*Berghuis*, *supra*, 560 U.S. at p. 385.)

We now turn to the question whether the waiver and confession were voluntary. The waiver in this case is inferred from defendant's confession, and defendant maintains that both were involuntarily given because he was coerced. Defendant lists a host of "tactics" that he said were "designed to overcome [his] decision not to incriminate himself," including "repeated questioning after invocation, lies and misrepresentations concerning the evidence, implied promises of leniency and benefits, verbal commands to talk, physical touching, and an approach of 'softening-up' [defendant]."

Before addressing each of these interrogation techniques, we note the following. First, when asked at the April 27 interview, defendant agreed that he had "always talked to [Hobson] voluntarily," and that Hobson had "never coerced [him], threatened [him], [or] promised [him] anything." (See, e.g., *People v. Spencer* (2018) 5 Cal.5th 642, 673 (*Spencer*) [taking account of the fact the defendant "acknowledged at the end of the interview that his confession was 'free and voluntarily given'" and that "the officers made him no promises and that they did not threaten him"]; *People v. Dykes* (2009) 46 Cal.4th 731, 753 (*Dykes*) [similar].)

Second, and more important, defendant himself identified why he confessed. The reasons did not involve any interrogation tactic that he now claims was coercive. Instead, defendant said he confessed because he felt "what [he] did was wrong" and because the police had recovered blood from his vehicle's seat. Of all the things Hobson told him, defendant said it was Hobson's disclosure that the police had found blood on his truck's jump seat that "convinced [him] that [he] should talk." Hobson's statement that the police had found Newhouse's blood on defendant's jump seat was true and cannot be said to have

been coercive. (*People v. Holloway* (2004) 33 Cal.4th 96, 115 (*Holloway*) [stating that proper questioning " 'may include exchanges of information, [and] summaries of evidence . . .' "].) Defendant's own words thus undermine his claim that he involuntarily confessed because of coercion.

We nonetheless examine seriatim the complained-of interrogation techniques. We do not find that, individually or collectively, these techniques served to overbear defendant's will or to render his confessions involuntary. Defendant first claims that Hobson improperly "continu[ed] to attempt to convince [defendant] to talk on April 21st after repeated invocations of [his] right to remain silent." We will return below to the claim that defendant "repeated[ly]" invoked his right to remain silent on April 21. For the purpose of determining whether the confessions were voluntary, however, it is enough to observe that — even assuming Hobson failed to heed defendant's invocations of the right to remain silent on April 21 — that failure did not produce the confession on April 22 or the statements thereafter. (See *People v. Williams* (2010) 49 Cal. 4th 405, 437 (*Williams*) ["A confession is not involuntary unless the coercive police conduct and the defendant's statement are causally related"].)

There is no evidence that what Hobson said to defendant after he lapsed into silence — the earliest time defendant claims he invoked his right against self-incrimination — caused defendant to confess. Hobson had already told defendant about the blood found in his truck before defendant stopped responding to questions. Thereafter, Hobson repeated the same exhortations to tell the truth that he employed before defendant stopped talking. Defendant was not swayed by what Hobson said, telling Hobson that if he "keep[s] beating on me," "[t]hen

I'm not gonna say nothing. I know me." And indeed, defendant made no inculpatory statement on April 21. It was not until the following day, after a night away from any importuning by Hobson, that defendant made the inculpatory statements.

In light of these facts, we find that Hobson's "continuing to attempt to convince [defendant] to talk on April 21" did not cause defendant to confess and so did not render his confession on April 22 or thereafter involuntary. (See *People v. Carrington* (2009) 47 Cal.4th 145, 172 (*Carrington*) ["we conclude that Sergeant Sherman's comments did not affect defendant's decision to confess to the murder of Esparza, because she maintained her innocence during the remainder of the second interview and, during the third interview, revealed that she already was aware that [what the sergeant said was false]"]; *Rundle*, *supra*, 43 Cal.4th at p. 114 ["Coercive police tactics by themselves do not render a defendant's statements involuntary if the defendant's free will was not in fact overborne by the coercion and his decision to speak instead was based upon some other consideration"].)

We come to the same conclusion with regard to defendant's assertions that Hobson engaged in "lies and misrepresentations concerning the evidence, implied promises of leniency and benefits, verbal commands to talk, physical touching, and an approach of 'softening-up' [defendant]." Defendant complains that Hobson lied to him when he told him that the eight-ball keychain had been " 'tested' and found to have been manufactured" later than when defendant said he found the item. Defendant, however, expressly disclaimed that the eight-ball keychain in itself caused him to confess, answering "[n]o" when Hobson asked, "What if all I had was the 8 ball? . . . Would you have confessed?" Moreover, "[t]he use of deceptive

statements during an interrogation . . . does not invalidate a confession unless the deception is ' " 'of a type reasonably likely to procure an untrue statement.' " ' " (*Carrington, supra,* 47 Cal.4th at p. 172.) We do not think that Hobson's representation about the keychain is of such a type. (See *People v. Smith* (2007) 40 Cal.4th 483, 505-506 (*Smith*) [listing cases in which courts have found similar deceptive interrogation tactics permissible].)

Defendant also claims that Hobson misrepresented that "three witnesses will testify" to seeing defendant's vehicle in Crawford's neighborhood. Defendant characterizes this as a "lie," because "[n]o such witnesses were ever called." Yet, weeks before he confessed, defendant himself admitted that he had driven down Crawford's street several times. Hobson's statement about the three witnesses, whether or not true, thus was not likely to procure an unreliable admission. (*Carrington, supra,* 47 Cal.4th at p. 172.)

Defendant attempts to bolster his argument about the supposed misrepresentations by claiming that Hobson "maximize[d] the psychological effect of his lies by repeatedly insisting that he could be trusted." We do not find that such statements are either inherently coercive or here served to undermine defendant's will. Certainly, however many times Hobson told defendant that he could trust him, defendant was not inclined to believe Hobson or confess because of the "lies." We should not forget that defendant was a grown man, experienced with the criminal justice system, physically healthy, and displaying no indication that he was especially susceptible to Hobson's representations. As such, defendant was rather well placed to resist interrogation. (See, e.g., *Dykes, supra,* 46 Cal.4th at p. 752.)

We are likewise unpersuaded that Hobson "falsely told [defendant] that the authorities would give him favorable consideration if [he] confessed." Hobson told defendant no such thing. The message Hobson conveyed was that both he and the district attorney wanted to know defendant's "story" and why defendant did what he did. Such sentiment cannot fairly be taken to imply that the district attorney would give defendant favorable treatment. (See *Carrington*, *supra*, 47 Cal.4th at p. 174 [finding that the interrogators' statements "did not constitute a promise of leniency" when "[t]he interviewing officers did not suggest they could influence the decisions of the district attorney, but simply informed defendant that full cooperation might be beneficial in an unspecified way"].) And even if what Hobson said might be construed as suggesting that defendant's version of events could make a difference in how he was prosecuted, this was not false. (*Holloway*, *supra*, 33 Cal.4th at p. 116 [observing that some circumstances "can reduce the degree of a homicide or, at the least, serve as arguments for mitigation in the penalty phase"].) In any event, Hobson "did no more than tell defendant of the benefit that might ' "flow[] naturally from a truthful and honest course of conduct." ' " (*Ibid.*) Such statements did not render defendant's subsequent statements involuntary. (*Id.* at p. 115.)

Defendant also complains that Hobson "physically touched [him] and told him that talking to Hobson was required." We do not see how the physical touching that occurred here was improper. Defendant makes "no claim of physical intimidation or deprivation." (*Holloway*, *supra*, 33 Cal.4th at p. 114.) Instead, he objects to the occasional touches on his person because they were purportedly "psychologically powerful." Yet, even if the touches constituted "psychological

ploys" and here "establish[ed] a false sense of rapport, intimacy, and caring," we still do not think that they were so coercive as to " 'tend to produce a statement that is both involuntary and unreliable.' " (*Smith*, *supra*, 40 Cal.4th at p. 501.)

In addition, although Hobson said things like, "you got to talk to me man," "[i]t's not going away," and, "[w]e have to deal with it," it is clear that that Hobson was not requiring defendant talk to him but exhorting him to do so. Moreover, defendant's conduct indicates that he knew he did not have to talk to Hobson. Even if his refusal to continue answering questions was not immediately honored on April 21, still defendant managed to stop the interrogation. He did not begin talking again until the next morning, and he did not give a full confession until Hobson transported him to a place (from the jail to the police station) more to his liking.

Finally, defendant relies on *People v. Honeycutt* (1977) 20 Cal.3d 150 to argue that, because the waiver came on the heels of Hobson's " 'clever softening-up' of [defendant] without advising him of his rights," the waiver was not valid. In *Honeycutt*, we said that "[w]hen the waiver results from a clever softening-up of a defendant through disparagement of the victim and ingratiating conversation, the subsequent decision to waive without a *Miranda* warning must be deemed to be involuntary . . . ." (20 Cal.3d at p. 160.) That holding finds no application in this case: Hobson did not disparage the victims, engage in conversations that could be fairly characterized as "ingratiating," or fail to give defendant *Miranda* warnings before he confessed. Moreover, *Honeycutt* has been limited to its facts. In *People v. Scott* (2011) 52 Cal.4th 452, 478, we identified "the two salient features of *Honeycutt*" as involving (1) an interrogating officer who had a prior relationship with the

defendant and who sought to "ingratiate" himself "by discussing 'unrelated past events and former acquaintances' " and (2) the officer disparaging the victim. (*Id.* at pp. 477-478.) When these two features are not present, we found reliance on *Honeycutt* to be "misplaced." (*Id.* at p. 478; see also *People v. Michaels* (2002) 28 Cal.4th 486, 511 (*Michaels*) [rejecting the defendant's reliance on *Honeycutt* when the facts presented "are not at all like *Honeycutt*, which . . . involved 'an unrecorded 30-minute, pre-*Miranda* conversation, discussing mutual acquaintances, past events and finally the victim' "]; *People v. Kelly* (1990) 51 Cal.3d 931, 954 [finding *Honeycutt* "clearly distinguishable" when "[n]o misconduct of [the type described in *Honeycutt*] occurred here"].) It is likewise misplaced in this case.

### iii. Failure to advise on April 22

Defendant alternatively argues that we should not focus on the confessions obtained after the *Miranda* advisement on April 22 but rather on the events preceding that advisement. Specifically, defendant calls our attention to the fact Hobson did not initially provide him with *Miranda* warnings when he approached him on April 22.[11] Only after defendant made two inculpatory statements — "I'm nothing but an animal, and I don't deserve to live" and "Nothing can justify what I did" — did Hobson read him his rights. Defendant claims that this shows that Hobson engaged in an impermissible "question first, warn later" technique that renders the warnings ineffective. As such,

---

[11] Defendant seems to assume that the *Miranda* advisement was necessary on the morning of April 22. It is not entirely clear that this is so, as defendant was reminded of his rights on April 21 and readvisement the next day may not have been necessary. (See, e.g., *Williams*, *supra*, 49 Cal.4th at p. 434.) Nonetheless, we engage with defendant's arguments as he has laid them out.

statements made after the warnings must be excluded. We cannot agree.

Under the high court's precedent, the mere fact that a defendant has made unwarned admissions does not render subsequent warned confessions inadmissible. (See generally, *Oregon v. Elstad* (1985) 470 U.S. 298 (*Elstad*); *Seibert*, *supra*, 542 U.S. 600.) In *Elstad*, *supra*, 470 U.S. at page 318, the court held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." Instead, as long as both the initial unwarned statement and the subsequent warned statement are voluntary, the warned statement may be deemed the product of a defendant's "rational and intelligent choice" to confess and so is admissible. (*Id.* at pp. 314, 318; see also *Williams*, *supra*, 49 Cal.4th at p. 448 ["Even when a first statement is taken in the absence of proper advisements and is *incriminating*, so long as the first statement was voluntary a subsequent voluntary confession ordinarily is not tainted simply because it was procured after a *Miranda* violation"].)

Given that we already found the warned confession in this case to be voluntary, we need only examine whether defendant's unwarned statements were also voluntary. The trial court here found "no evidence that defendant's will was overcome" when he made the unwarned statements. We agree. The unwarned portion of the interview on April 22 was short. Hobson testified that his entire conversation with defendant at the jail lasted no more than 15 minutes and defendant made the two inculpatory statements within the first five minutes. During this time, defendant was unrestrained and sitting in an employee break room. Prior to defendant's utterance of the two inculpatory

admissions, Hobson's statements to defendant that most directly related to the crimes were "the situation . . . wasn't going to go away" and Hobson "needed him to tell . . . his side of the story." Consistent with our previous explanation, we do not find such statements to be coercive.

For his part, defendant appeared to have readily cooperated. When Hobson told defendant that he wanted him to tell the truth, defendant answered, "Okay," but requested to be taken "someplace else" first. Hobson then said to defendant that before he "transported him back to the police department," he "wanted to make sure he understood exactly what we were going to be doing and the questions that I was going to be asking him." Hobson thereafter advised defendant of his *Miranda* rights, and defendant admitted to being responsible for the disappearance and death of Newhouse and Crawford. Nothing about this exchange suggests that defendant's statements prior to receiving the advisement were involuntary. As such, although the unwarned statements must be suppressed (and they were), the warned confession on April 22 and subsequent statements were properly admitted.

Defendant, however, argues that *Elstad* does not apply because "Hobson deliberately used a 'question first,' warn later technique in violation of *Missouri v. Seibert*." In *Seibert*, the high court confronted a situation where the interrogating officer "made a 'conscious decision' to withhold *Miranda* warnings." (*Seibert*, *supra*, 542 U.S. at pp. 605-606.) The police officer testified that he did so in accordance with "an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that [the suspect] already provided once.'" (*Id.* at p. 606.) Another police officer testified that his department "promoted"

"the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession." (*Id.* at p. 609.)

Under such circumstances, a majority of the high court found the warned confession inadmissible. (*Seibert, supra,* 542 U.S. at p. 604 (plur. opn.); *id.* at p. 618 (conc. opn. of Kennedy, J.).) The court fractured, however, on why that is so. A plurality of four justices explained that "when interrogators question first and warn later" (*id.* at p. 611 (plur. opn.)), the later, warned confession is admissible only if "in the circumstances the *Miranda* warnings given could reasonably be found effective." (*Id.* at p. 612, fn. 4 (plur. opn.).) Under the facts of the case, the four justices concluded that the circumstances "do not reasonably support a conclusion that the warnings given could have served their purpose," and the postwarning statements therefore were inadmissible. (*Id.* at pp. 616-617 (plur. opn.).)

Justice Kennedy concurred in the judgment but proposed a different rule. In Justice Kennedy's view, the plurality's test "cuts too broadly." (*Seibert, supra,* 542 U.S. at pp. 621-622 (conc. opn. of Kennedy, J.).) Justice Kennedy instead "would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." (*Id.* at p. 622 (conc. opn. of Kennedy, J.).) Under that approach, where the "deliberate two-step strategy" was not employed, "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad*." (*Ibid.*)

The fractured nature of *Seibert* has given rise to a debate over whether it is the plurality's opinion or Justice Kennedy's concurrence that provides the controlling standard. (Compare

*U.S. v. Ray* (6th Cir. 2015) 803 F.3d 244, 272 ["we adopt *Seibert* plurality's multi-factor test for this Circuit and direct the district court to apply this test"] with *U.S. v. Capers* (2d Cir. 2010) 627 F.3d 470, 476 ["this Court joined the Eleventh, Fifth, Ninth, Third, and Eighth Circuits in applying Justice Kennedy's approach in *Seibert*"]; *U.S. v. Kiam* (3d Cir. 2006) 432 F.3d 524, 532; *U.S. v. Mashburn* (4th Cir. 2005) 406 F.3d 303, 309 ["Justice Kennedy's opinion therefore represents the holding of the *Seibert* Court"]; *U.S. v. Courtney* (5th Cir. 2006) 463 F.3d 333, 338; *U.S. v. Ollie* (8th Cir. 2006) 442 F.3d 1135, 1142; *U.S. v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1157-1158; *U.S. v. Street* (11th Cir. 2006) 472 F.3d 1298, 1313.) We need not decide the matter here, as the result in this case would be the same under either approach. (See *U.S. v. Faust* (1st Cir. 2017) 853 F.3d 39, 48, fn. 6 ["Because we find that Faust's argument fails under either [the plurality or the concurrence's] approach, there is no need to address this question here]; *U.S. v. Heron* (7th Cir. 2009) 564 F.3d 879, 885 [similar]; *U.S. v. Carrizales-Toledo* (10th Cir. 2006) 454 F.3d 1142, 1151 [similar]; *U.S. v. Straker* (D.C. Cir. 2015) 800 F.3d 570, 617 [similar].)

Under the plurality's approach, the relevant inquiry in a "question first" scenario is "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." (*Seibert*, *supra*, 542 U.S. at pp. 611-612 (plur. opn.).) In other words, "could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier?" (*Id.* at p. 612 (plur. opn.).) In making this determination, the trial court is to consider a number of factors, including "the completeness and detail of the questions and

answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." (*Id.* at p. 615 (plur. opn.).)

A consideration of these factors cuts in favor of admitting defendant's confessions. Although all of the relevant questioning here was conducted by a single person (Hobson) over the course of a single day (thus satisfying the "continuity of police personnel" factor), there was no extended questioning before *Miranda* warnings were given; defendant's prewarning responses, though undoubtedly incriminating, were nonspecific and lacking in detail; and, at defendant's request, there was a change of setting before he gave the detailed confession that was ultimately used against him at trial. (*Seibert, supra*, 542 U.S. at pp. 615-616 (plur. opn.).) Moreover, the conversation that preceded the second round of interrogation alerted defendant that he had a "real choice" whether to follow up on his earlier incriminating statements or "stop talking." (*Id.* at p. 612 (plur. opn.).) Before reading defendant his rights, Hobson informed defendant that he "wanted to make sure [defendant] understood exactly what we were going to be doing and the questions I was going to be asking . . . so we didn't spend another two hours of wasted time." Hobson's statements reasonably signaled to defendant that it was up to him whether he wanted to answer Hobson's questions or, alternatively, to "waste" Hobson's time. Under these circumstances, we conclude that the warnings "function[ed] 'effectively' as *Miranda* requires." (*Seibert, supra*, 542 U.S. at pp. 612-613 (plur. opn.).)

Defendant's statement was likewise admissible under Justice Kennedy's approach. According to Justice Kennedy,

*Seibert* does not control unless Hobson employed "the two-step interrogation technique . . . in a calculated way to undermine the *Miranda* warning." (*Seibert, supra,* 542 U.S. at pp. 622 (conc. opn. of Kennedy, J.).) We find no such deliberateness here.

Although Justice Kennedy "did not articulate how a court should determine whether an interrogator used a deliberate two-step strategy," the facts of *Seibert* and *Elstad* afford us some guidance. (*U.S. v. Williams, supra,* 435 F.3d at p. 1158.) On the one hand, we have nothing here like the circumstances of *Seibert.* There is no evidence that the San Luis Obispo Police Department or District Attorney's Office had a policy of "withholding *Miranda* warnings until after interrogating and drawing out a confession," or that Hobson was following such a policy when he interrogated defendant. (*Seibert, supra,* 542 U.S. at p. 609 (plur. opn.).)

On the other hand, like the officers in *Elstad,* Hobson did not provide warnings because he failed to "realize that a suspect is in custody and warnings are required." (*Seibert, supra,* 542 U.S. at p. 620 (conc. opn. of Kennedy, J.); *Elstad, supra,* 470 U.S. at pp. 315-316.) Hobson testified that he did not advise defendant of his *Miranda* rights on April 21 and did not immediately provide him with those rights when he approached him on April 22 because defendant "was not in custody on the . . . disappearance of Rachel Newhouse and Aundria Crawford. He was in custody on a parole violation." In line with Justice Kennedy's identification of a failure to "realize that a suspect is in custody and warnings are required" as a scenario properly analyzed under *Elstad* principles, we find that *Siebert* does not

control here. (*Seibert*, *supra*, 542 U.S. at p. 620 (conc. opn. of Kennedy, J.).)[12]

Other aspects of Hobson's conduct persuade us that he did not engage in "a two-step questioning technique based on a deliberate violation of *Miranda*." (*Seibert*, *supra*, 542 U.S. at p. 620 (conc. opn. of Kennedy, J.).) Significantly, Hobson advised defendant of his *Miranda* rights *before* defendant confessed. (See *Bobby v. Dixon* (2011) 565 U.S. 23, 31 ["unlike in *Seibert*, there is no concern here that police gave Dixon *Miranda* warnings and then led him to repeat an earlier murder confession, because there was no earlier confession to repeat"].) Hobson also did not attempt to use defendant's prewarning

---

[12]    Of course, Hobson did provide defendant with *Miranda* warnings on the morning of April 22 after defendant made vaguely incriminating statements. This raises the question of whether Hobson thought that defendant's custody status had changed at that point. On this issue, we note that Hobson did not tie his recitation of the *Miranda* warnings to defendant's custody status. Instead, he described the sequence of events in this way: After defendant asked to be taken "someplace else," he (Hobson) "told [defendant] before I transported him back to the police department I wanted to make sure he understood exactly what we were going to be doing and the questions that I was going to be asking him so we didn't spend another two hours of wasted time. [¶] So at that point I advised Rex Krebs of his Miranda rights, as read from the DOJ form, and then I asked him the two questions." Thus, although Hobson never pinpointed the precise moment he believed defendant's custody status changed, the timing of his advisement is consistent with the (mistaken) belief that (1) defendant became "in custody" after incriminating himself in response to Hobson's "two questions," or (2) defendant acquired "in custody" status after being transported to the police station, when Hobson got to "doing" what he was going to do and asking "the questions [he] was going to be asking."

statements to induce him to talk after advising him of his rights under *Miranda.* (*Bobby v. Dixon, supra,* 565 U.S. at p. 31 ["[n]or is there any evidence that police used Dixon's earlier [unwarned] admission to forgery to induce him to waive his right to silence later"]; contra, *Seibert, supra,* 542 U.S. at p. 605 (plur. opn.) [interrogating officer "confronted [the suspect] with her prewarning statements"].)

To be sure, Hobson could have read defendant his *Miranda* rights before defendant made inculpatory statements or agreed to tell the truth. Yet simply because an officer could have given an advisement earlier is not enough to show that he delayed "in a calculated way to undermine the *Miranda* warning." (*Seibert, supra,* 542 U.S. at p. 622 (conc. opn. of Kennedy, J.); see *People v. San Nicolas* (2004) 34 Cal.4th 614, 637, 639 [no finding of deliberateness despite the officer stating "[i]f you want to talk to me, I'll advise you of your rights" but then forgoing the advisement when the suspect indicated that he wanted to talk to an attorney first].) Likewise, that advisement did issue after acquiescence to tell the truth does not mean that the officer sought to undermine *Miranda.* (See *Williams, supra,* 49 Cal.4th at p. 448 [reasoning that the principles of *Elstad* apply even when advisement came only after "the defendant's letting 'the cat out of the bag' "].) Last, even if Hobson had no good reason for failing to give *Miranda* warnings when he first approached defendant on April 22, there is no ground to believe Hobson acted deliberately "to obscure both the practical and legal significance of the admonition when finally given" or that his conduct had such an effect. (*Seibert, supra,* 542 U.S. at p. 620 (conc. opn. of Kennedy, J.).)

In light of the preceding, we find that defendant's warned confessions were properly admitted despite his prior unwarned statements.

### iv. Failure to heed invocation on April 21

Defendant further argues that the trial court erred in admitting the statements he made on April 22 and thereafter because Hobson failed to honor defendant's invocation of his right to remain silent on April 21. We agree that Hobson should have stopped his interrogation on April 21 sooner than he did. However, in light of the facts that defendant made no inculpatory statements on April 21, that Hobson did not overcome defendant's will that day or any time thereafter, that Hobson's failure to honor defendant's invocation was not causally related to defendant's subsequent decision to confess, and that, at the time of his confession on the next day, defendant's right to cut off questioning was honored, we find no error in the admission of the confession.

As the trial court found and the prosecution conceded, defendant invoked his right to remain silent on April 21.[13] Like the trial court, we need not decide the precise moment when defendant made his invocation, except to observe that it was later than when defendant claims he first asserted his right but earlier than when Hobson said he understood defendant to have done so.

---

[13] Hobson testified that he thought defendant asserted his right to remain silent when he stated near the end of the interview on April 21, "Nothing to say." The prosecution's opposition to the motion to suppress acknowledged that defendant had invoked his right at "the end of the interview."

Defendant did not invoke his right to silence by merely saying nothing for 15 minutes while Hobson talked. Prior to the conversation arriving at this point, defendant had waived his *Miranda* rights — first by signing a waiver on April 1 and again by talking to Hobson after being reminded of his rights on April 21. (See, e.g., *North Carolina v. Butler* (1979) 441 U.S. 369, 373.) Because defendant had previously waived his rights, a subsequent invocation must be unambiguous to be effective. (E.g., *Berghuis, supra,* 560 U.S. at pp. 381-382; *People v. Martinez* (2010) 47 Cal.4th 911, 948 (*Martinez*).) In essence, he needed to say "that he wanted to remain silent or that he did not want to talk with the police." (*Berghuis, supra,* 560 U.S. at p. 382 [holding that a suspect who did neither of these things following an earlier waiver "did not invoke his right to remain silent"].) In the absence of such unambiguous statements, Hobson was free to continue questioning defendant. (*Martinez, supra,* 47 Cal.4th at p. 948 [" 'Faced with an ambiguous or equivocal statement, law enforcement officers are not required . . . either to ask clarifying questions or to cease questioning altogether' "].)

Likewise, when defendant requested that Hobson "[p]ut me down in a holding cell and let me think," he did not unambiguously invoke his right to remain silent. Rather, he likely "merely asked for a break from questioning." (*Rundle, supra,* 43 Cal.4th at p. 116.) Because defendant was then housed at the county jail and so presumably could not be left in the police station's holding cell for long, the request to be put back in a holding cell (so he could "think") is reasonably interpreted as a request to be left alone for a moment. Interpreted this way, the statement stands in contrast to what defendant said when Hobson returned from giving him a five-

minute break: "Take me back to jail." At that point, defendant has arguably indicated that, beyond wanting a temporary break from questioning, "he did not want to talk with the police." (*Berghuis*, *supra*, 560 U.S. at p. 382.) And even if this later statement was ambiguous in the context of defendant's previous request for a short break (see *Williams*, *supra*, 49 Cal.4th at p. 429), any ambiguity was resolved when defendant said, for the first of two times, "Nothing to say." By this point at the latest, defendant had unambiguously invoked his right to remain silent and Hobson should have stopped the interrogation.

Hobson did not stop. Instead, he continued questioning defendant until defendant once again asserted that he had "nothing to say." Hobson testified that he understood defendant to have invoked only at this point, when defendant repeated himself. Even with this understanding, however, Hobson asked defendant still more questions while transporting him back to jail.

Yet, despite the failure to honor defendant's right to remain silent on April 21, Hobson made no contact with defendant for the next 18 hours. Moreover, as the trial court found, defendant did not foreclose the possibility of Hobson returning the next day. Indeed, when Hobson returned the following morning, defendant showed no reluctance to talk, readily answering questions and voluntarily confessing.

The question is whether Hobson's failure to honor defendant's invocation to remain silent on April 21 renders inadmissible the statements obtained on April 22 and thereafter. In *Michigan v. Mosley* (1975) 423 U.S. 96, 104 (*Mosley*), the high court held "the admissibility of statements

obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' "[14]  The court did not address a situation in which the right to cut off questioning was eventually, but not immediately, honored.

In the years since *Mosley* was decided, we have never found that an initial failure to honor a defendant's invocation — whether of the to remain silent or the right to have counsel present — poses a categorical bar to the admission of any subsequent statement regardless of the circumstances.  Instead, in case after case, we have held that despite the initial failure to

---

[14]  California courts initially did not follow *Mosley*, rejecting it in favor of the rule that "after a defendant has once demonstrated he does not wish to waive his privilege against self-incrimination, the police cannot lawfully subject him to a new round of interrogation even if they repeat the *Miranda* warnings." (*People v. Pettingill* (1978) 21 Cal.3d 231, 238, 251.) In 1982, however, California voters approved Proposition 8 and amended the state Constitution to add a "Right to Truth-in-Evidence." Under this provision, "relevant evidence shall not be excluded in any criminal proceeding." (Cal. Const., Art. I § 28, subd. (f)(2).)

Although we have never expressly held that Proposition 8 abrogated *Pettingill*, our cases have clearly nodded in this direction. (See *People v. May* (1988) 44 Cal.3d 309, 318 ["Given the probable aim of the voters in adopting section 28[(f)(2)], . . . it is not reasonably likely that the California voters intended to preserve, in the form of a 'statutory' privilege, a judicially created exclusionary rule expressly rejected by the United States Supreme Court under the federal Constitution"]; *In re Lance W.* (1985) 37 Cal.3d 873, 889 [similar]; *Martinez, supra*, 47 Cal.4th at p. 950 [applying *Mosley* without mentioning *Pettingill*].) Perhaps for this reason, defendant does not seek to rely on *Pettingill*, and we accept that the analysis should proceed without reference to the *Pettingill* rule.

honor a *Miranda* invocation, a *voluntary* confession obtained during a *subsequent* interrogation is admissible. Thus, in *People v. Bradford* (1997) 14 Cal.4th 1005, 1040-1043 (*Bradford*), we held that a warned confession was admissible despite the fact that (1) a day earlier, detectives had persisted in interrogating the defendant after he answered, " 'No. I want my lawyer,' " in response to the questions, " 'Do you wish to give up the right to remain silent? Do you want to talk to me about what happened last night?' " (*id.* at p. 1025), and (2) the continued questioning produced an admission that the defendant killed the victim. We reasoned that suppression was not necessary because the first confession was " 'unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will' " and the second (warned) confession was " 'knowingly and voluntarily made.' " (*Id.* at p. 1040.) We likewise did not suppress warned statements in *People v. Storm* (2002) 28 Cal.4th 1007, 1039, despite the police having ignored the defendant's invocation of the right of counsel during an interrogation two days earlier. We reached the same result in *People v. Sims* (1993) 5 Cal.4th 405, 444, even though the police there interrogated the suspect despite his clear statement from the day before that he "would not waive his [*Miranda*] rights." (*Id.* at p. 437.) In contrast, we suppressed the defendant's confession in a case where we found the police not only "intentionally continued interrogation . . . in spite of defendant's invocation," but also induced an involuntary confession. (*People v. Neal* (2003) 31 Cal.4th 63, 68, 74.)

In light of our precedent, we conclude that Hobson's failure to honor defendant's invocation of the right to remain silent on April 21 does not compel the suppression of the voluntary, warned statements taken on April 22 and thereafter.

Apart from his failure to immediately cease questioning, Hobson's interrogation techniques were not coercive. In addition, no " 'other circumstances' " existed to " 'to undermine the suspect's ability to exercise his free will.' " (*Bradford*, *supra*, 14 Cal.4th at p. 1040.) Indeed, defendant's will was not overcome on April 21 or at any time thereafter. Although defendant was subdued during the April 21 interrogation and cried during the drive back to the county jail, he showed a clear ability to exercise his free will, including by stopping the interrogation, refusing to incriminate himself, controlling when he would be dropped off at the jail (by requesting that Hobson drive around so that he could smoke), and directing Hobson to turn into the jail despite Hobson's last request for defendant to take him to the bodies. Likewise, as explained *ante*, in part II.B.1.ii, he exercised his free will when he voluntarily confessed on April 22 after receiving his *Miranda* advisement.

Nor should we forget that there was a period of about 18 hours in which defendant was subjected to no questioning after invoking his right to remain silent. (Contra, *People v. Peracchi* (2001) 86 Cal.App.4th 353, 362 [finding that a confession should have been suppressed because "[d]espite Peracchi's invocation of his right to remain silent, the officer persisted in asking him questions regarding why he did not wish to speak with the officers at that time without even a momentary cessation in questioning"]; *Anderson v. Terhune* (9th Cir. 2008) 516 F.3d 781, 791 [suppressing a confession when the court was "not faced with a situation where there was a break in questioning after the *Miranda* invocation"].) This was substantially longer than the two-hour period in *Mosley* in which the suspect was left alone and the court found questioning could be reinitiated. (*Mosley*, *supra*, 423 U.S. at p. 104.)

Finally, even though he did not do so immediately, Hobson did honor defendant's right to cut off questioning. On April 21, Hobson asked if he could return to talk to defendant the next day if he did not hear back from him, and defendant replied "Maybe I'll deal with it tomorrow," or "Maybe. I'll deal with it tomorrow." Whatever defendant's exact response was, it seems that Hobson could reasonably have understood it as conveying that he could return the next day — if only to find out whether defendant was willing to talk. When Hobson came to the jail on April 22, defendant expressed no desire to remain silent, thus indicating that he had decided that he would talk.

We reject defendant's reliance on *People v. Montano* (1991) 226 Cal.App.3d 914. In *Montano*, the court found that Montano's confession was actually coerced. In that case, not only did police officers ignore Montano's double-digit number of invocations, they "aggravated the situation by using their common religion to conjure up in defendant's mind the picture of confessing to avoid going to hell." (*Id.* at p. 935.) Moreover, the tactics "succeeded because the officers were not employing them on a person who had a history of experience with police interrogation or on someone who in the circumstances would have unlimited powers of resistance. At the time of the interrogation defendant was 18 years old, having entered the country illegally 8 months before." (*Id.* at pp. 935-936.) In these circumstances, Montano's will was overcome and he "tacitly admitted that he alone was responsible for the victim's murder." (*Id.* at p. 937.) In contrast, defendant here was not merely 18 years old; he did have "a history of experience with police interrogation" (*id.* at p. 935); and he made no admission during the interrogation in which he invoked his right to silence. (*Ibid.*)

Defendant simply was not coerced, and *Montano* supplies no basis to suppress the confessions at issue here.

To summarize, defendant was at no time coerced. He was given an 18-hour break from interrogation after invoking his right to remain silent; he left open the possibility for the officer to reinitiate contact, and upon being contacted, cooperated with the interrogation. When he confessed, his confessions were preceded by *Miranda* warnings that effectively apprised him of his rights. Without suggesting that all of the above must be present or that any of those factors is sufficient, we conclude that under these circumstances, the trial court did not err in admitting the postadvisement confession obtained on April 22 and thereafter.

### 2. *Independent evidence of rape and sodomy of Crawford*

Defendant next argues his convictions for the rape and sodomy of Crawford must be reversed because "insufficient evidence aside from [his] confession exists to support" the convictions. Defendant's argument relies on the corpus delicti rule, which "requires corroboration of the defendant's extrajudicial utterances insofar as they indicate a crime was committed, and forces the People to supply, as part of their burden of proof in every criminal prosecution, some evidence of the corpus delicti aside from, or in addition to, such statements." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1178, italics omitted (*Alvarez*).) We find that defendant's confession was adequately corroborated in this case.

"The amount of independent proof of a crime required [to satisfy the corpus delicti rule] is quite small." (*People v. Jones* (1998) 17 Cal.4th 279, 301.) The prosecution need not adduce

"independent evidence of every physical act constituting an element of an offense." (*Id.* at p. 303.) Instead, it need only make "some indication that the charged crime actually happened," so as to ensure "that the accused is not admitting to a crime that never occurred." (*People v. Jennings* (1991) 53 Cal.3d 334, 368 (*Jennings*).)

In challenging his convictions for the rape and sodomy of Crawford, defendant's sole contention is that there was no independent evidence "corroborating that she was in fact sexually assaulted." He concedes that there was "sufficient independent evidence of rape against Newhouse since her body was naked from the waist down when found." In contrast, he asserts there was insufficient evidence as to Crawford because "Crawford's body was fully clothed in sweat pants and a sweatshirt." The Attorney General disputes that Crawford was fully clothed when she was found. Dr. Sterbenz, the pathologist who observed the exhumation of the victims' bodies, testified that Crawford was found "partially clothed," wearing "black sweat pants" and "a black sweatshirt" with "a logo on it for the Hard Rock cafe." Crawford's mother testified that her daughter normally wore to bed "T-shirt and panties," items that were missing when her body was found. She also testified that the Hard Rock Cafe sweatshirt was a "souvenir-type sweatshirt" that her daughter would "just wear . . . for special occasions."

The testimony reasonably gives rise to the inference that Crawford's body was found "dressed differently" from when she was taken from her house. Crawford was taken from her house early in the morning after having gotten out of bed, as independently corroborated by the state of her bed and the fact that she was talking to a friend by phone until 2:46 a.m. on March 11, 1999. Based on the timing and her mother's

testimony, the jury could have concluded that Crawford was wearing underwear and a T-shirt when defendant abducted her. Yet, her body was found with no underwear, no T-shirt, and clothed in a "special occasion[]" sweatshirt that she did not normally wear to bed. Thus, there was circumstantial evidence that Crawford was " 'disrobed' " and " 'covered . . . again' " after she was kidnapped. (*People v. Ochoa* (1998) 19 Cal.4th 353, 404.) This evidence suffices to satisfy the corpus delicti of rape.[15] (*Id.* at pp. 404-406 [finding the requisite corpus delicti for rape when the victim was found with her pants on backwards and her sweatshirt inside out, allowing for the inference that she was disrobed and reclothed]; see also *Alvarez*, *supra*, 27 Cal.4th at p. 1171 ["[t]he independent proof may be circumstantial and need not be beyond a reasonable doubt"].)

Because the People have established the corpus delicti for rape, they have also established the corpus delicti for sodomy. (See *People v. Jones*, *supra*, 17 Cal.4th at p. 302-304 [finding the corpus delicti for oral copulation satisfied although there was no physical evidence on victim's mouth because there was semen in the victim's other orifices and "we have never interpreted the corpus delicti rule so strictly that independent evidence of every physical act constituting an element of an offense is necessary"]; accord, *Robbins*, *supra*, 45 Cal.3d at p. 886.) Accordingly, we affirm the convictions for the rape and sodomy of Crawford.

---

[15] Because we find "the physical evidence, and reasonable inferences drawn therefore, satisfy the corpus delicti rule," we need not decide whether other-crimes evidence, including the rape and sodomy of Shelley C. and the rape of Newhouse, also establish the corpus delicti with regard to Crawford. (*Jennings*, *supra*, 53 Cal.3d at p. 367; cf. *People v. Robbins* (1988) 45 Cal.3d 867, 886 (*Robbins*).)

## C. Penalty Phase Issues

### 1. *Arguments involving testimony of defendant's volitional impairment*

Defendant makes a series of arguments relating to Dr. Dietz's testimony that sexual sadism does not impair an individual's ability to control his or her behavior. The gist of defendant's arguments is that the testimony is inconsistent with the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.) or is demonstrably false as shown by the existence of the act. Defendant also argues that the trial court erred by excluding references to the SVPA and by failing to "give proper instruction in light of the State's expert testimony." On these bases, defendant urges us to reverse the death sentence.

### a. *Background*

Despite being an expert for the prosecution, Dr. Dietz agreed with Dr. Berlin, the defense expert, on many substantive points. In particular, Dietz agreed with Berlin's diagnosis of defendant as a sexual sadist and an alcoholic. Dietz also "agree[d] entirely" with Berlin that "people do not choose their sexual deviations. They do not choose to become a sexual sadist."

Dr. Dietz, however, disagreed with Dr. Berlin regarding his diagnosis of antisocial personality disorder. In Dietz's opinion, defendant did have antisocial personality disorder. Dietz explained the criteria for diagnosing the disorder, and cited examples from defendant's history to show that he met the diagnostic criteria.

In addition, although Dr. Dietz agreed with Dr. Berlin's diagnosis of sexual sadism, he offered a different understanding of the disorder. According to Dietz, the sexual disorder

"amounts to saying what is it that turns the person on." For a person who is a sexual sadist, the things that he or she finds sexually arousing include "bondage," "captivity," dominance, "humiliation," "spanking and whipping," and "choking and strangulation." Dietz did not deny that it was "a problem to have in life to want to do that to another person." He explained, however, that "[t]he way that people cope with that problem is quite variable." Although there were sexual sadists who "commit violent crimes in order to fulfill their fantasies," Dietz stressed that "just a tiny group of the sexual sadists . . . ever get to that point."

Crucially, Dr. Dietz disagreed with Dr. Berlin regarding whether sexual sadism compromised an individual's ability to control his or her actions. As Dietz categorically stated, "[s]omeone whose only problem is sexual sadism has only one fundamental difference from normal people and that is a difference in what excites them sexually. It doesn't affect how they think. It doesn't affect their emotions. It doesn't affect their capacity to control themselves. It only affects what it is that turns them on sexually."

The prosecution then asked Dr. Dietz about the "policeman at the elbow" test. Dietz responded that "[t]hat's a test . . . long . . . used in the field of forensic psychiatry as a way of looking at whether someone has volitional control, do they have the free will to conform to the law." Dietz, like Berlin, stated that "had there been a policeman at [defendant's] elbow, he certainly would not have committed these crimes." As such, Dietz concluded that defendant "was fully aware that this was wrong behavior and capable of stopping it with those kinds of external controls."

The prosecution then asked Dr. Dietz to evaluate Dr. Berlin's opinion. In particular, the prosecution asked, "Dr. Berlin talked about the sexual sadism and the fantasies almost becoming a compulsion. Is that — is that an opinion that's widely held in your field?" Dietz answered, "No, it isn't. But there is a group of people who are not in my field who come at it from a Christian counseling point of view who have become very fond of the idea of this being an addiction that begins with masturbation, exposure to pornography, obscene phone calls. And if one doesn't find some spiritual relief or additional aid, it can degenerate into horrible kinds of behavior such as this. [¶] That's not an accepted medical or psychological view. It's the fad that's been around the last ten or fifteen years. [¶] And that's like the theory of this being a compulsion." When cross-examined, Dietz nonetheless agreed that "the jury, as part of the process of making a decision in this case, should consider and listen to Dr. Berlin," specifically his opinion that "sexual sadism . . . opens the door to irresistible impulse." "[T]he jury's got a difficult job here," Dietz explained, and "we're in an area where there are competing points of view." Later in his testimony, Dietz reiterated that "it's arguable — that this [sexual sadism] affects impulse control. It's arguable that you could look at it the way Dr. Berlin does. I respect his opinion, but I disagree with him."

Despite his testimony that sexual sadism does not cause volitional impairment, Dr. Dietz acknowledged that a mental disorder contributed to defendant's behavior. In his opinion, however, that mental disorder was antisocial personality disorder, not sexual sadism. As Dietz opined, "I think that the reason [defendant] behaves in this way toward victims is because he has an antisocial personality disorder. I think if he

76

were a sexual sadist who didn't have the — this disorder, he wouldn't be doing these bad acts." In response to further questioning, Dietz confirmed, "If he were only sexually sadistic and did not have any other impairment, he wouldn't have done that [assaulted Jennifer E. or raped Shelley C.]."

Dr. Dietz, like Dr. Berlin, was ultimately asked to opine "whether at the time of the offense the capacity of the defendant . . . to conform his conduct to the requirements of the law was impaired as a result of a mental disease or defect." Dietz gave a two-part answer. First, he said that defendant did not suffer from a mental disease or defect, as he defined those terms: "mental diseases . . . are those conditions that cause a person to have a profoundly entirely different view of reality than a normal human being" and mental defects referred to "mental retardation." Second, Dietz said, "even if he did [suffer from a mental disease or defect], we have evidence that his volitional control was there." Dietz then detailed the various decisions defendant made that demonstrated he made a choice to rape Newhouse and Crawford. These included "his decision to drink," as "he's never even attempted rape when he's sober"; "his decision to lie to Dr. True," telling "Dr. True he wasn't having sexual temptations, that he wasn't drinking"; the decision to "cruise," or look for victims; the decision to "carry a rape kit, which eventually came to include a mask, precut lengths of rope, duct tape for gagging the victim . . ."; and finally, the decision, "after the fight at Outlaws Bar," to "stop[] trying to control his fantasies and urges and . . . not make the effort anymore to resist the urges that he had." This last decision, "rather than his not having the ability to control himself," led to the deaths of Newhouse and Crawford.

### b. Analysis

### i. Asserted inconsistent theories

Defendant argues that the prosecution "committed prejudicial error by presenting evidence and theories regarding volitional impairment [that are] inconsistent with those presented by the People in civil commitment cases." According to defendant, the People's experts in civil commitment proceedings routinely testify that sexual disorders impair a person's ability to control him- or herself. Yet, the prosecution in this case called an expert who said that sexual sadism has no such effect. Defendant contends that this amounts to inconsistent prosecutorial theories and the use of such theories violated his right to due process under both the United States and California Constitutions.[16]

Defendant is correct that "[a]t least where the punishment involved is death, due process is as offended by the People's inconsistent and irreconcilable attribution of culpability-increasing acts as by the inconsistent and irreconcilable attribution of crimes." (*In re Sakarias* (2005) 35 Cal.4th 140, 160.) But he ignores the principle that where "the asserted inconsistencies in prosecutorial theory were not the subject of

---

[16] In a cursory manner, defendant also argues that the same asserted inconsistencies violated the Eighth Amendment. Neither of the cases he cites supports the idea that "the Eighth Amendment . . . could be violated when the State takes inconsistent positions for tactical advantages in a capital sentencing proceeding." (See *Bradshaw v. Stumpf* (2005) 545 U.S. 175, 187 [stating only that the court "express[ed] no opinion on whether the prosecutor's actions [in arguing inconsistent theories about who shot the victim] amounted to a due process violation"]; *Caldwell v. Mississippi* (1985) 472 U.S. 320 [no mention of inconsistent theories].)

any proceeding in the trial court and, hence, neither the inconsistencies nor any explanations the prosecutor may have been able to offer appear in the appellate record, any due process claim defendant can state should be 'presented by petition for writ of habeas corpus rather than by appeal.'" (*People v. Sakarias* (2000) 22 Cal.4th 596, 635 (*Sakarias*); see *Spencer, supra*, 5 Cal. 5th at p. 694 [citing cases supporting the proposition that "an inconsistent theories claim should be brought — not on appeal — but in a habeas corpus petition"].)

Defendant's claim thus must be rejected because "the asserted inconsistencies . . . were not the subject of any proceeding in the trial court." (*Sakarias, supra*, 22 Cal.4th at p. 635.) Defendant concedes he did not argue before the trial court that Dr. Dietz's testimony was inconsistent with the SVPA, and our review of the record confirms that to be the case. Although defendant alerted the court that he wanted to ask Dr. Berlin about the SVPA, the bases on which he sought to introduce the testimony were not to show any inconsistencies between the SVPA and Dietz's opinion. Instead, defendant argued that the SVPA was relevant because the program showed that (1) a "mental disorder that lead to this lack of volitional control was treatable" and (2) defendant's lack of treatment was due to institutional failure.

To be sure, defense counsel mentioned in passing that the SVPA "is impeachment of what I believe is Dr. Dietz's position that there is not volitional impairment." However, counsel never developed this position. Instead, he pressed the argument concerning the treatability of sexual disorders and the issue of institutional failure. Unsurprisingly, the court ruled only with respect to these bases for admissibility.

In addition, when the court rejected defendant's arguments and so excluded references to the SVPA, it made clear that its ruling was tentative. The court expressly stated that it would be willing to reconsider its position. Despite the court's invitation, however, defendant never brought a motion or thereafter called the court's attention to any purported inconsistencies between the SVPA and Dr. Dietz's opinion. Probably for this reason, the record contains no explanation from the prosecutor about the asserted inconsistencies.[17]

Under such circumstances, we find that "the asserted inconsistencies in prosecutorial theory were not the subject of any proceeding in the trial court." (*Sakarias, supra,* 22 Cal.4th at p. 635.) We therefore reject defendant's inconsistent theories claim, leaving it to be raised on habeas corpus.

### *ii. Asserted false or misleading testimony*

Similar to his claim that Dr. Dietz's testimony was inconsistent with the SVPA, defendant contends that Dietz's testimony was false, as demonstrated by the existence of the SVPA. Defendant argues the prosecution violated his due process rights by relying on and failing to correct such false or misleading testimony. (See, e.g., *People v. Morrison* (2004) 34

---

[17] Because defendant never raised the argument at trial, he never had to explain why the fact that other prosecutors, in unrelated civil cases, may call experts to opine that individuals suffering from certain mental disorders are predisposed to committing criminal sexual acts here amounts to the use of inconsistent prosecutorial theories. (See Welf. & Inst. Code, § 6600 et seq.) At a minimum, defendant's theory of a due process violation is quite different from the situation we confronted in *In re Sakarias, supra,* 35 Cal.4th 140, and nothing we say here should be taken as suggesting that we find them similar or endorsing an expansion of *In re Sakarias.*

Cal.4th 698, 716-717.) Unlike the inconsistent-theories claim, we can decide this false-evidence claim on appeal.

First, we note that the claim is forfeited. Defendant complains that four different statements offered by Dr. Dietz were false or misleading. These include: (1) "a paraphilia does not impair volition"; (2) "Dr. Berlin's view that it does is unaccepted"; (3) "the 'police man at elbow' test is the appropriate test for volitional impairment"; and (4) "sexual sadism [is] not . . . a 'mental disease or defect.'" Yet, defendant did not object to any of this testimony at the time it was offered. Accordingly, the claim that the evidence should not have been introduced or that the prosecution violated due process by introducing such evidence is forfeited. (Evid. Code, § 353, subd. (a); *People v. Hajek and Vo* (2014), 58 Cal.4th 1144, 1214 (*Hajek and Vo*); *People v. Partida* (2005) 37 Cal.4th 428, 436 ["To the extent, if any, that defendant may be understood to argue that due process required exclusion of the evidence for a reason different from his trial objection, that claim is forfeited"].)

Second, even if we were to overlook defendant's forfeiture, we still would not be convinced that the SVPA shows Dr. Dietz's testimony to be false. The SVPA is a civil commitment scheme that permits the state to involuntarily confine individuals proved to be "sexually violent predators."[18] (*In re Howard N.* (2005) 35 Cal.4th 117, 127.) A "sexually violent predator" is "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually

---

[18] Defendant was never found to be a sexually violent predator.

violent criminal behavior." (Welf. & Inst. Code, § 6600, subd. (a)(1).)) "Diagnosed mental disorder," in turn, is defined as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (Welf. & Inst. Code, § 6600, subd. (c).) The SVPA does not specify that any particular condition meets this definition. It makes no mention of any sexual disorder, let alone the specific disorder of sexual sadism. The language of the SVPA thus furnishes no evidence to suggest that Dr. Dietz's testimony regarding the volitional effect of sexual sadism was false.

Perhaps for this reason, defendant cites a number of "published cases regarding SVP trials." We question the value of such cases to show that Dr. Dietz's testimony was false. First, we are aware of no authorities establishing that an expert's testimony is false *as a matter of law*, just because it purportedly conflicts with other expert opinions given in other trials. Thus, the fact that various experts may have offered opinions contrary to Dietz's does not mean these opinions have established that any particular disorder precludes a defendant from controlling his or her behavior. Instead, that remained an issue to be resolved by the jury upon hearing the opposing experts' testimony. (Accord, *Ake v. Oklahoma* (1985) 470 U.S. 68, 81 ["Psychiatry is not . . . an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness. Perhaps because there often is no single, accurate psychiatric conclusion . . ., juries remain the primary factfinders [and] . . . must resolve differences in

opinion within the psychiatric profession on the basis of the evidence offered by each party."].)

Second, the opinions in the cases cited do not conflict with Dr. Dietz's testimony. Dietz opined that for a person "whose *only problem* is sexual sadism," the disorder did not impair his or her volition. (Italics added.) In other words, sexual sadism, by itself, does not affect the individual's capacity to control him or herself. Dietz did *not* testify that no sexual disorder affected an individual's volition, or that individuals diagnosed with sexual sadism *and* other mental disorders still categorically have full control of themselves.

Yet, defendant would have us read Dr. Dietz's opinion this way. Defendant complains that the prosecution's theory at trial, as established by Dietz's testimony, is that "paraphilia does not impair volition." Paraphilia, or more accurately "paraphilic disorders," is the term psychiatrists use to refer to sexual disorders. The fourth edition of the Diagnostic and Statistical Manual of Mental Disorders, the version in use at the time of defendant's trial, discusses nine different paraphilic disorders. (Diagnostic and Statistical Manual of the American Psychiatric Association (4th ed. 2000) pp. 569-576 [referencing exhibitionism, fetishism, frotteurism, pedophilia, sexual masochism, sexual sadism, transvestic fetishism, voyeurism, and paraphilia not otherwise specified (paraphilia NOS)]; *People v. Roberge* (2003) 29 Cal.4th 979, 983, fn. 1 (*Roberge*).) Sexual sadism is one of the nine paraphilic disorders; it is one specific paraphilia. Hence, the prosecution's theory was never that "paraphilia," meaning any and all paraphilic disorders, left a person in full control of him- or herself. Instead, it was that one particular paraphilic disorder — sexual sadism — did not compromise a person's ability to control him- or herself.

Thus, to the extent that cases applying the SVPA can have a bearing on whether Dr. Dietz's testimony about volitional control was false, they must address sexual sadism. Yet many of the cases defendant cited did not involve an individual diagnosed with sexual sadism.[19] (E.g., *Kansas v. Crane* (2002) 534 U.S. 407, 411 (*Crane*) [defendant diagnosed with exhibitionism and antisocial personality disorder]; *Kan. v. Hendricks* (1997) 521 U.S. 346, 354-356 (*Hendricks*) [defendant diagnosed with pedophilia]; *People v. Shazier* (2014) 60 Cal.4th 109, 118-121 [defendant variously diagnosed with paraphilia NOS, personality disorder NOS, narcissistic traits, or simply personality disorder]; *People v. Williams* (2003) 31 Cal.4th 757, 761-762 [diagnoses of paraphilia NOS and psychosis NOS]; *People v. Hurtado* (2002) 28 Cal.4th 1179, 1184 [pedophilia and antisocial personality disorder]; *Albertson v. Superior Court* (2001) 25 Cal.4th 796, 799 [paraphilia NOS and antisocial personality disorder]; *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1150 (*Hubbart*) [paraphilia NOS, with features of bondage, " 'rape, sodomy and klismaphilia' "].) These cases do not help us evaluate the truth or falsity of Dietz's testimony that *sexual sadism* does not impair volition.

Nor do cases that feature a combination of diagnoses, of which sexual sadism is only one, assist us. (E.g., *People v. Allen* (2008) 44 Cal.4th 843, 852-854 ["defendant's mental disorders include paraphilia (specifically, an urge for sex with nonconsenting adults), antisocial personality disorder, psychosis, and cocaine dependency"]; *Roberge*, *supra*, 29 Cal.4th at p. 983 [after changing her mind, one of the People's experts

---

[19] A majority of the cases cited also postdate defendant's trial.

diagnosed the defendant with sexual sadism while the other expert diagnosed him with paraphilia NOS and antisocial personality disorder]; *People v. Leonard* (2000) 78 Cal.App.4th 776, 781 [defendant was diagnosed with "two mental disorders: (1) paraphilia, rape, or sexual sadism; and (2) antisocial personality disorder"].)  Dr. Dietz testified that individuals "whose only problem is sexual sadism" do not suffer from volitional impairment.  He offered no categorial opinion regarding persons suffering from sexual sadism and other mental impediments.  Accordingly, SVPA cases containing testimony that a defendant was volitionally impaired and that he or she was diagnosed with multiple mental disorders do not contradict Dietz's opinion.[20]

We likewise find no evidence to suggest that Dr. Dietz testified falsely when he stated that Dr. Berlin's view was not "widely held" within his field.  We simply do not know what were the views of psychiatrists on sexual sadism and the ability to control oneself.  Dietz himself testified that " 'we're in an area where there are competing points of view' " and said that although he disagreed with it, the jury should consider Berlin's opinion.  Insofar as defendant suggests Dietz's views *must* have been false, his suggestion relies on the premise that we can treat all paraphilic disorders as interchangeable.  Nothing in the record or the cases cited allows us to do so.

---

[20]    To the extent Dr. Dietz testified that *defendant*, who he diagnosed as suffering from both sexual sadism and antisocial personality disorder, was not volitionally impaired, his testimony rested on the specific circumstances of defendant's case.  The fact that somebody else suffering from the same conditions may be impaired does not demonstrate that Dietz's testimony was false.

Similarly, we cannot conclude that Dr. Dietz provided false or misleading testimony in stating that the "policeman at the elbow" test was a test "used in the field of forensic psychiatry as a way of looking at whether someone has volitional control." True: We have interpreted the SVPA's requirement of a "condition affecting the emotional or volitional capacity" (Welf. & Inst. Code, § 6600, subd. (c)) to mean a condition that "causes *serious difficulty* in controlling violent sexual impulses," and not one as to which "such control is *impossible*." (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 921, fn. 12; see *People v. Williams*, *supra*, 31 Cal.4th at p. 776; *Crane*, *supra*, 534 U.S. at pp. 411-412.) Yet, Dietz was never asked to apply this particular standard of volitional impairment. He also did not say that the "policeman at the elbow" test showed that defendant had little difficulty in controlling his behavior. Instead, Dietz testified that the test indicated defendant "was fully aware that this was wrong behavior and capable of stopping it with those kinds of external controls." This was entirely consistent with Dr. Berlin's testimony.

Finally, we reject defendant's argument that Dr. Dietz "falsely and misleadingly suggested that only severely psychotic or severely retarded persons could have the requisite 'mental disease or defect' to establish volitional impairment under the statutory mitigating factor (h)" of section 190.3. Dietz never mentioned section 190.3, factor (h), or urged the jury to accept the idea that "only severely psychotic or severely retarded persons could have the requisite 'mental disease or defect' to establish volitional impairment." Indeed, given the extensive testimony of Berlin and Dietz, no rational jury could have drawn this conclusion. Berlin and Dietz argued at length about whether sexual sadists suffered from volitional impairment, but

the argument never pivoted on whether sexual sadism was or was not a severe psychosis or a form of intellectual disability. Dietz did not opine that defendant could control himself because he suffered from neither severe psychosis nor serious intellectual disability. Rather, he testified that defendant did not suffer from a mental disease or defect but even if he did, his behavior showed that his volitional capability was intact. The testimony did not mislead the jury in the way defendant suggests.

In sum, we find that Dr. Dietz did not testify falsely and, as such, the prosecution did not violate due process by failing to "correct" his testimony.

### iii. Exclusion of testimony concerning the SVPA

Defendant next contends the trial court's exclusion of testimony regarding the SVPA violated his Sixth Amendment right to fully and fairly cross-examine Dr. Dietz and his Eighth Amendment right to produce mitigating evidence.

We begin with the Eighth Amendment claim. The " 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence." (*Tennard v. Dretke* (2004) 542 U.S. 274, 285.) "Thus, a State cannot bar 'the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.' " (*Ibid.*) Despite this constitutional proscription, "the trial court still ' "determines relevancy in the first instance and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury." ' " (*People v. Williams* (2006) 40 Cal.4th

287, 320; see also *Romano v. Oklahoma* (1994) 512 U.S. 1, 12; *People v. McDowell* (2012) 54 Cal.4th 395, 431; *People v. Loker* (2008) 44 Cal.4th 691, 731.) A trial court's decision to exclude asserted mitigating evidence is reviewed for an abuse of discretion. (E.g., *People v. McDowell, supra,* 54 Cal.4th at pp. 433-434; *People v. Salcido* (2008) 44 Cal.4th 93, 162; *People v. Williams, supra,* 40 Cal.4th at p. 320.)

Here, the trial court excluded references to the SVPA when it rejected both of defendant's bases for admissibility. The court found that the SVPA was irrelevant to the issue of institutional failure because defendant was, correctly, found ineligible for confinement as a sexually violent predator (SVP). Because defendant was not an SVP, he could not rely on the SVPA to argue that the penal system should have afforded him treatment available to those confined under the terms of the statute. The court distinguished defendant's case from *People v. Mickle* (1991) 54 Cal.3d 140, 193 (*Mickle*), in which we held that evidence that a defendant "had sought and/or been denied treatment which might have controlled the same dangerous personality disorder that purportedly contributed to the instant crimes" was "relevant and admissible."

We agree that *Mickle* does not control the case before us. In *Mickle*, the excluded evidence concerned "the state's 'improper' diagnosis and treatment" of the defendant. (*Mickle, supra,* 54 Cal.3d at p. 193.) In this case, the SVPA has no bearing on whether the state improperly diagnosed and treated defendant, given that defendant was not entitled to any care under the statute.

Moreover, even if the trial court erred by excluding testimony about the SVPA for the purpose of establishing

institutional failure, the error was harmless under any applicable standard. (*People v. Williams*, *supra*, 40 Cal.4th at p. 320.) Multiple witnesses testified regarding the failure to provide appropriate care. Two correctional officers from Soledad prison told the jury that there was no counseling for "sexual predators" available at the prison and, even if there were, inmates probably would not attend out of a concern for their safety. Officer Zaragoza likewise said that San Luis Obispo County afforded paroled sex offenders no "confidential psychotherapy." The only treatment parolees like defendant got was from the outpatient clinic, and Dr. True, the doctor in charge of that clinic, testified that he had very limited resources. True further testified had resources been available, he would have placed defendant in a number of additional treatment programs. A different expert, Dr. Haney, opined that defendant "received no psychotherapy, really no psychotherapy throughout his entire life" despite clear signs that he needed treatment. Defense counsel also emphasized institutional failure as a mitigating factor in closing argument. Under such circumstances, "[n]o prejudice occurred." (*Mickle*, *supra*, 54 Cal.3d at p. 194.)

The trial court also disallowed testimony about the SVPA for the purpose of bolstering Dr. Berlin's testimony that sexual sadism was a treatable condition. In so doing, the court exercised its broad discretion under Evidence Code section 352, finding the SVPA's probative value to be "very limited" and "substantially outweighed by . . . consumption of time." The court explained that the probative value of the statute was low because the SVPA "wasn't passed to treat [offenders]." Although treatment is mandated under the SVPA (Welf. & Inst. Code, § 6606, subd. (a)), an individual may be involuntarily committed

even when treatment is neither expected to be "successful" nor "potentially successful." (*Id.* subd. (b) ["Amenability to treatment is not required for a finding that any person is a person described in Section 6600, nor is it required for treatment of that person. Treatment does not mean that the treatment be successful or potentially successful . . . ."]; *Hubbart, supra,* 19 Cal.4th at p. 1167; accord, *Hendricks, supra,* 521 U.S. at p. 366; *People v. McKee* (2010) 47 Cal.4th 1172, 1195.) Accordingly, when treatment is understood to mean effective treatment or treatment that is at least "potentially successful," the probative value of the statute to show treatability is indeed limited. (Welf. & Inst. Code, § 6606, subd. (b).) Moreover, the court correctly noted that testimony about the SVPA would have resulted in "consumption of time, which would be required to basically educate the jury as to how the SVP[A] came about, what the requirements are, what the purpose of the statute is," etc. We therefore cannot say that the trial court abused its discretion in excluding the evidence.

In addition to treatability and institutional failure, defendant claims that he "clearly" advanced another theory of admissibility at trial: "to support Dr. Berlin's testimony and prove that a paraphilia, and more specifically sexual sadism, was generally accepted by state experts, jurists and prosecuting attorneys nationwide to be the type of disorder that is capable of impairing volitional control." Defendant overstates how "clearly" he argued this basis for admitting evidence of the SVPA. But even assuming that he preserved the claim and the trial court erred in excluding the evidence, any error was harmless. Dr. Dietz himself stated that "we're in an area where there are competing points of view." He told the jury "it's arguable — that this [sexual sadism] affects impulse control.

It's arguable that you could look at it the way Dr. Berlin does." Dietz informed the jury that he respected Berlin's opinion and said it should consider Berlin's testimony that "sexual sadism . . . opens the door to irresistible impulse." Given Dietz's on-point testimony about the credibility of his opponent's view regarding volitional impairment and sexual sadism, exclusion of testimony about the SVPA — a statute that does not even mention sexual sadism — did not result in prejudice.

We next examine defendant's Sixth Amendment argument that the exclusion of testimony concerning the SVPA violated his right to fully and fairly cross-examine Dr. Dietz. To prevail on his claim (assuming he has preserved it for review), defendant must show that had Dietz been confronted with the evidence, "the 'cross-examination would have produced "a significantly different impression of [the witness's] credibility." ' " (*People v. Dement* (2011) 53 Cal.4th 1, 52 (*Dement*); *People v. Linton* (2013) 56 Cal.4th 1146, 1188 (*Linton*); *People v. Quartermain* (1997) 16 Cal.4th 600, 623-624.)

We do not think that introduction of testimony about the SVPA would have significantly affected the jury's impression of Dr. Dietz's credibility. The witness was thoroughly cross-examined, including by being confronted with his own affidavit from a prior case. In the affidavit, Dietz attested that sexual sadism (1) "open[ed] the door to irresistible impulse testimony from some experts"; (2) was "arguably the basis for a finding of extreme emotional distress where the offender feels impelled by strong sexual urges to commit the offense"; and (3) was a disorder " 'for which specific treatments are available . . . that can reduce or eliminate dangerousness.' " When so confronted, Dietz not only acknowledged that he held those opinions, but also said that he had changed his mind only on "one point," no

longer taking "the position that treatment can eliminate dangerousness." Accordingly, Dietz was impeached by his own testimony on precisely those points on which defendant claims the SVPA was relevant. Further impeachment with testimony concerning the SVPA would not have "produced ' "a significantly different impression of [his] credibility." ' " (*Dement, supra,* 53 Cal.4th at p. 52; accord, *People v. Smith* (2015) 61 Cal.4th 18, 59-60 [explaining that there was no error when the court excluded certain expert testimony after it "issue[d] a narrow ruling" that still permitted testimony "in some areas"].)

Defendant also complains that the restriction on his ability to confront Dr. Dietz damaged his own expert's credibility. For the same reason given in our discussion of defendant's Eighth Amendment claim, we do not find that had testimony regarding the SVPA been admitted, the jury would have received a " ' "significantly different impression" ' " of Dr. Berlin's credibility. (*Dement, supra,* 53 Cal.4th at p. 52.)

In sum, we find no error in the exclusion of testimony about the SVPA. When we have assumed error, the error was harmless.

### iv. *Imposition of the death penalty upon persons with a mental disorder that reduces their volitional control*

Defendant contends imposition of the death penalty on persons with a mental disorder that reduces their volitional control to such a degree that they can be subject to civil detention is excessive under the Eighth Amendment. Defendant's argument relies on *Atkins v. Virginia* (2002) 536 U.S. 304, 321 in which the high court held that "death is not a suitable punishment for a mentally retarded criminal."

Defendant urges us to extend the rationale of *Atkins* to mentally disordered criminals, making such offenders categorically ineligible for the death penalty. We have considered such invitations before and have consistently declined them. (E.g., *People v. Powell* (2018) 5 Cal.5th 921, 962-963 (*Powell*); *People v. Ghobrial* (2018) 5 Cal.5th 250, 275-276; *People v. Mendoza* (2016) 62 Cal.4th 856, 908-911 (*Mendoza*); *People v. Boyce* (2014) 59 Cal.4th 672, 719-722; *Hajek and Vo*, *supra*, 58 Cal.4th at pp. 1250-1252.) Defendant advances no persuasive reason for us to reconsider our position, notwithstanding his assertion of "a recent trend by state legislatures to view sexually violent offenders' crimes as the product of a non-psychotic mental disorder which nevertheless impairs their volitional control." The same trend was in effect when we decided the line of cases above, including cases from just a year ago.

Consistent with our precedent, we reject defendant's claim. "We leave it to the Legislature, if it chooses, to determine exactly the type and level of mental impairment that must be shown to warrant a categorical exemption from the death penalty." (*Hajek and Vo*, *supra*, 58 Cal.4th at p. 1252.)

### v. *Jury instruction regarding lack of volitional control*

Defendant contends the trial court erred in failing to give an instruction defining the term "mental disease or defect." Following the language of section 190.3, factor (h), the court instructed the jury that it should consider "whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication." Defendant argues the court had a duty to supplement this instruction on its own

motion and instruct the jury as to the meaning of the term "mental disease or defect." Without such an instruction, "the jury . . . may have accepted Dietz's testimony and wrongly ascribed a restrictive meaning to the statutory phrase 'mental disease or defect' and therefore concluded that [defendant's] paraphilic disorder did not qualify under factor (h)."

We are not convinced that the trial court was obliged to define "mental disease or defect" in the absence of a party's request. A court's duty to define statutory terms "arises where the terms have a technical meaning that is peculiar to the law." (*People v. Howard* (1988) 44 Cal.3d 375, 408.) In contrast, "[w]hen a word or phrase ' "is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request." ' " (*People v. Estrada* (1995) 11 Cal.4th 568, 574 (*Estrada*).) We have never held that as used in section 190.3, factor (h), the phrase "mental disease or defect" carries a technical, legal meaning requiring clarification on the court's own motion. To the contrary, " '[t]he language of a statute . . . is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification.' " (*Estrada, supra*, 11 Cal.4th at p. 574.) Defendant attempts to persuade us otherwise by citing cases that deal with the term "mental disease or defect" in the context of legal insanity. (*In re Ramon M.* (1978) 22 Cal.3d 419, 424-428; *People v. Weaver* (2001) 26 Cal.4th 876, 968-969.) Those cases are clearly inapposite because legal insanity *is* a technical, legal concept.

Moreover, defendant's argument is not really that the term "mental disease or defect" has some meaning other than

that " ' "commonly understood by those familiar with the English language." ' " (*Estrada, supra,* 11 Cal.4th at p. 574.) Instead, it is that because a witness in this case has supplied a definition for the term, the jury may be misled into adopting that definition rather than using "the meaning that might be ascribed to the same terms in common parlance." (*Id.* at p. 575.) Hence, defendant's argument is really that the court should have given an instruction to dissipate any potential confusion caused by this particular witness's testimony. At most, this amounts to an argument for a pinpoint instruction to "relate particular facts to a legal issue in the case." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.) Such instructions "are not required to be given sua sponte." (*Ibid.*)

In any event, even assuming the court should have instructed the jury on its own motion, the failure to do so was harmless. As discussed earlier, no reasonable juror could have drawn from the testimony of Drs. Berlin and Dietz the conclusion that "only severely psychotic or severely retarded persons could have the requisite 'mental disease or defect' to establish volitional impairment." The prosecution's closing argument bolsters the point. In discussing section 190.3, factor (h), the prosecutor made no mention of whether defendant was or was not psychotic or intellectually disabled. Instead, he argued that defendant did not suffer "sexual compulsion." The prosecutor referred to Dr. Dietz's testimony, stating "Dr. Dietz . . . said that [defendant] makes his choices." "But," said the prosecutor, "you know you don't need an MD to know that. . . . You should know that as well." The prosecution thus exhorted the jury to rely on its own experience, not any definition supplied by Dietz (which was not even mentioned). Read as a whole, the testimony and arguments are entirely inconsistent with the

possibility that the jury may have been "misled about the nature of the statutory mitigating factor."

Finally, even if the jury was somehow misled about section 190.3, factor (h), it could still consider defendant's sexual sadism, antisocial personality disorder, and any other diagnosis of a mental condition under the section 190.3, factor (k), the "catchall" factor. (Accord, *People v. Smith* (2005) 35 Cal.4th 334, 353 ["even though [section 190.3] factor (d) refers to 'extreme' emotional or mental disturbance, evidence of mental disorder of less extreme character is admissible under factor (k)"].) No reversible error occurred.

### 2. *Restriction on testimony that witnesses believed defendant should not be executed*

Defendant contends the trial court erred in limiting testimony from some witnesses who would have testified that they believed defendant should not be executed. The court allowed defendant's mother, sister, former girlfriend (Adonia Krug), the mother to his son (Rosalynn Moore), and a spiritual advisor to respond to the question whether each thought defendant should receive life in prison instead of death. Each gave the unsurprising answer that she thought defendant should live. However, when defendant asked the same question of Mosher, a staff member at the Children's Home where defendant was sent when he was 15, the prosecution objected and the court sustained the objection. The court based its ruling on the fact Mosher last saw defendant in 1983 and no longer had a significant relationship with him. The defense then made an offer of proof that Mosher, other staff members at the Children's Home, and Scheyt — the mother of the girl defendant dated in 1981 — would have testified that they thought defendant should not receive the death penalty. The court affirmed its ruling as

to all of these witnesses. Accordingly, although Mosher, other members of the Children's Home, and Scheyt testified to defendant's various positive characteristics and their high opinions of him, they did not say whether they believed defendant's life should be spared.

"[E]vidence that a family member or friend wants the defendant to live is admissible to the extent it relates to the defendant's character . . . ." (*People v. Smith, supra*, 35 Cal.4th at p. 367.) To be admissible, the witness must "have a significant relationship with the defendant." (*Ibid*.) We have not, however, considered whether a person whose significant relationship with the defendant ended more than a decade before the event for which the defendant is on trial must be allowed to give an opinion regarding whether he or she wants the defendant to live. (Cf. *People v. Smith, supra*, 35 Cal.4th at pp. 366-367 [finding that an educational therapist who had a significant relationship with the defendant until three years before his crime should have been allowed to testify that she did not want him executed]; *Mickle, supra*, 54 Cal.3d at p. 194 [finding that the opinion of a close family friend that the defendant's life should be spared was relevant and admissible]; *People v. Heishman* (1988) 45 Cal.3d 147, 180, 194 (*Heishman*) [holding that a former wife who had a daughter with the defendant six years before the crimes in question should have been allowed to say whether she thought the death penalty was appropriate for him].) We need not reach the issue here because, even assuming that the trial court should have permitted people who knew defendant as a teenager to opine that his character was such that he should live, the exclusion of the testimony was harmless.

Multiple people pleaded with the jury to spare defendant's life. His mother, sister, a childhood girlfriend (who kept in contact with defendant), the mother of his child, and a spiritual advisor all said that they wanted him to live. Moreover, the witnesses who were not allowed to give their opinion regarding the penalty nonetheless offered "direct evidence of defendant's character" and their testimony was "generally so supportive of defendant that it is very unlikely that any juror would infer that [they] would want to see him put to death." (*People v. Smith*, *supra*, 35 Cal.4th at p. 368; *Heishman*, *supra*, 45 Cal.3d at p. 194.) Under such circumstances, "it is not reasonably possible that the jury would have returned a different penalty verdict" had it heard these witnesses say that defendant should not be executed. (*People v. Ervin* (2000) 22 Cal.4th 48, 103; see *People v. Smith*, *supra*, 35 Cal.4th at p. 368; *Heishman*, *supra*, 45 Cal.3d at p. 194.)

### 3. *Testimony of a former girlfriend concerning her relationship with defendant*

Defendant contends the trial court abused its discretion by admitting testimony concerning why his relationship with former girlfriend Liesel Turner ended. Over a defense objection, the court allowed Turner to testify as follows. Although the relationship was initially "very nice, very romantic," Turner eventually became frightened of defendant. Defendant told Turner that his former girlfriend "had been raped and murdered and that he had committed a crime so that he could get put in jail so that he could go kill the person that had raped and murdered her." When Turner stated defendant told her he had killed the person, the court interrupted. The court instructed the jury that Turner's statements that defendant murdered someone "are admissible just to show why someone reacted to

those statements.  It's not admitted to show that what's in the statement is true. . . .  There's not going to be any evidence that what [defendant] said is, in fact, true, in fact, occurred.  The reason the statement is admissible is just to show why Ms. Turner reacted to it."  Turner continued testifying, stating that she eventually ended her relationship with defendant because she "didn't feel safe."

Before the trial court, defendant argued that Turner's entire testimony was improper because it exceeded the scope of permissible rebuttal.  The trial court rejected the argument, finding that the testimony served two purposes:  (1) to rebut "character" testimony that defendant "does have the good quality that he can have a good relationship with women," as defendant's prior girlfriends (Krug and Moore) testified; and (2) to rebut testimony from witnesses who said defendant's relationship with Turner was "good."

The court's reasoning is sound and supported by the record.  Defendant had elicited statements from four women — Krug, Moore, Krug's mother, and a friend (Jaime Prisco) — to establish that he had good intimate relationships with women.  In addition, he drew from two witnesses the testimony that defendant and Turner had a "good" relationship.  Hence, to the extent that Turner's testimony showed that she became afraid of defendant and broke up with him because she "didn't feel safe," the testimony tended to rebut the impression that defendant's relationship with women in general — and Turner in particular — was as good as defendant's witnesses had suggested.  " ' "The admission of rebuttal evidence rests largely within the sound discretion of the trial court and will not be disturbed on appeal in the absence of 'palpable abuse.' " ' "

(*People v. Smith, supra,* 35 Cal.4th at p. 359.) We find no such abuse here.

Defendant further argues that even if Turner's testimony was relevant, it should have been excluded under Evidence Code section 352. We agree Turner's statement that defendant told her he killed a person to avenge a girlfriend's death had the potential to create undue prejudice. However, the court properly instructed the jury that the statement was not admitted for its truth (to show that defendant did kill someone for revenge) but only to explain Turner's state of mind (to explain why she became afraid of defendant). "Absent some showing to the contrary, we presume the jury followed the court's instructions." (*People v. Merriman* (2014) 60 Cal.4th 1, 48-49 (*Merriman*).) Defendant has not made such a showing, despite arguing it was impossible for the jury to believe that Turner was afraid of defendant without also believing that defendant "did in fact plot and engage in murder." A boast that one has killed a person is disturbing in and of itself, even if it was an empty boast intended to "impress" a girlfriend. The trial court did not abuse its discretion by determining that, being admitted for a limited purpose, the probative value of Turner's statement was not substantially outweighed by the danger of undue prejudice.

### 4. *Admission of photograph of defendant*

Defendant contends the trial court abused its discretion by admitting in the penalty phase a photograph of him, shirtless and flexing. The prosecution authenticated the photograph as having been taken in February 1999, after defendant killed Newhouse but before he killed Crawford. The court allowed the prosecution to admit the photograph as an exhibit and to display

it to the jury during closing argument. Because defendant had presented testimony and otherwise argued that he showed remorse after his arrest, the court admitted the photograph as evidence tending to suggest that the remorse was not genuine. As the court stated, "here one of the main mitigating factors that's being argued is remorse. . . . I think it would be a reasonable inference for the jury to look at this photograph and decide that his remorse didn't begin until he was arrested" and so was "self-serving." The court acknowledged that the photograph was "ambiguous," or capable of giving rise to more than one inference, but found that its admission would not be "overly prejudicial," because the adverse inference was not "an unfair [one] to draw."

On appeal, defendant raises the same arguments that were rejected at trial. He first asserts the photograph had no relevance pertaining to remorse (or the lack thereof) because "[r]emorse is a complex, changing state of mind, and is not something that can be proved to be absent or present merely by a picture." Defendant's argument misses the mark. Under Evidence Code section 210, relevant evidence is evidence "having *any* tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Italics added.) Accordingly, to be relevant and admissible, the photograph did not need to "prove[]" "a complex, changing state of mind"; it needed only to have a "tendency" to do so. (*Ibid.*) In this case, the photograph tended to corroborate evidence introduced at the guilt phase that defendant appeared "in a good mood," "joking around," and "happy" in March 1999, shortly after he killed Crawford and before he was arrested. As such, it gave rise to a "reasonable inference . . . that [defendant's] remorse didn't begin until he was arrested." This,

in turn, suggested that defendant's "displays of remorse and acts of contrition" were not genuine and therefore should be afforded little value in mitigation. (See, e.g., *Hajek and Vo, supra,* 58 Cal.4th at p. 1239.) The trial court did not abuse its "considerable discretion" in finding the photograph relevant. (*Merriman, supra,* 60 Cal.4th at p. 74.)

Second, defendant argues that the photograph should have been excluded under Evidence Code section 352. Specifically, he asserts that (1) "the court erred by failing to weigh prejudice against probative value" because it mistakenly treated the photograph as " 'circumstance of the crime' " evidence under Penal Code section 190.3, factor (a); and (2) properly weighted, the photograph should have been excluded because it was unduly prejudicial.

We do not think the trial court failed to weigh the value of the evidence against the risk of undue prejudice. "[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1169 (*Taylor*); see *People v. Riel* (2000) 22 Cal.4th 1153, 1187-1188.)

In this case, "the record as a whole" does so show. (*Taylor, supra,* 26 Cal.4th at p. 1169.) Before admitting the photograph, the trial court heard argument from both sides outside of the presence of the jury. The court subsequently stated, "on the 352 issue, . . . I think 352 is different in the penalty phase than it is in the guilt phase. And I think the penalty phase, you go to the cases which deal with the victim impact evidence. And obviously . . . some evidence presented in the penalty phase [is]

emotional or . . . prejudicial and, in some cases overly so." "Ultimately," concluded the court, "the court's direction has been that you need to discern whether [the evidence at issue] would divert the jury's attention from [its] duty in the penalty trial and whether it would do so in a way that is unfair. [¶] . . . The real test for rebuttal evidence simply is[,] is it proper rebuttal. And . . . my judgment is the only way to — for 352 to exclude it at that point would be if it would unfairly — be unfair in the sense that it would divert the jury's attention from [its] ultimate duty." The court thereafter admitted the photograph.

Given this record, we cannot say that the court failed to perform its duty under section 352 of the Evidence Code. The trial court "held an extensive hearing outside the jury's presence to determine whether to admit the photograph[]" (*Taylor*, *supra*, 26 Cal.4th at p. 1169) and its statements during that hearing showed that it understood that it could exclude the photograph on section 352 grounds if the photograph "would divert the jury's attention from [its] ultimate duty." Although the court also mentioned "cases which deal with the victim impact evidence," it is clear that the court did not confuse the photograph with victim impact evidence or apply some standard of prejudice that was unique to such evidence. Considered as a whole, the record does not support defendant's claim that the trial court mistakenly treated the photograph as Penal Code section 190.3, factor (a)'s "circumstances of the crime" evidence.

Regarding the issue of prejudice, defendant contends the photograph was the prosecution's "most potent weapon," as shown by the fact that the prosecutor displayed an enlarged image of the photograph for about 18 minutes during its hour-long closing argument. He also makes much of the trial court's remark that the prosecution "use[d] the photo effectively in

argument." Using a photograph to cast doubt on defendant's supposed remorse may have been effective, but there is nothing improper about effective argument, or argument that capitalized on the probative value of a piece of evidence. Put differently, frequent use of a piece of evidence to undermine a defendant's attempt at mitigation does not equate to undue prejudice. (See, e.g., *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 824 [" ' " ' "Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent" ' " ' "].) Having examined the photograph ourselves and reviewed the record for the way in which it was used, we find the court did not abuse its discretion in admitting the image. (See, e.g., *Michaels, supra*, 28 Cal.4th at p. 532.)

### 5. *Admission of evidence that defendant lied about shooting a person*

To support his diagnosis of antisocial personality disorder, Dr. Dietz recounted various instances in defendant's history in which he had displayed the diagnostic criterion of "deceitfulness, as indicated by repeated lying." Defendant now complains about one such instance of deceitful conduct as relayed by Dietz.

The incident involved a shooting of a man in Santa Barbara in 1987. During his April 27, 1999 interview, Hobson asked defendant, "Just before you went to prison in '87, somebody called Crime Stoppers, San Luis Obispo here, and identified you as shooting somebody in the chest in Santa Barbara three times over a drug deal. Wasn't you?" Defendant answered, "Shoot somebody in the chest three times, no. Wasn't me." After the tape recorder was turned off, however, defendant admitted that he had shot a man in the leg that year. Hobson

documented the admission in a report, which was provided to Dr. Dietz. The doctor, in turn, told the jury that defendant "was asked about whether he had shot a man in Santa Barbara," and after having "said no, he hadn't done it," "he subsequently admitted to Investigator Hobson that he had been the guy that shot a man in the leg in Santa Barbara in 1987." On cross-examination, defense counsel suggested that Dietz did not know whether defendant really shot a person in 1987. Dietz agreed but countered that "[w]hether he lied when he said he didn't [shoot a person] or lied when he said he did, one of them's a lie."

On appeal, defendant accuses Dr. Dietz of having improperly "vouched" to the jury that defendant in fact shot a man three times in the chest. We disagree. In his testimony, Dietz said that after having first denied the incident, defendant "subsequently admitted" that he "shot a man in the leg in Santa Barbara in 1987." Dietz never said that defendant shot somebody in the chest three times. More to the point, the incident was relevant to the doctor's opinion insofar as the inconsistency between the denial and the admission showed that defendant was being deceitful in his interview with Hobson. The actual details of how defendant shot the person — and indeed whether defendant shot a person in Santa Barbara in 1987 at all — were immaterial.

In short, Dr. Dietz's testimony could not reasonably be understood as vouching that defendant shot a person three times in the chest, and the prosecution did not commit misconduct in presenting his testimony.

> 6. *Suggestion that defendant was convicted of sexual*
>    *assault relating to the Jennifer E. incident*
>
> a. *Background*

Connie Ridley, defendant's mother, testified that her son should be spared the death penalty because "until the last few years, [he] has hurt no one." The prosecution sought to impeach this assertion with pretrial statements Ridley made to its investigators. According to an investigator's report, Ridley had said that defendant "got into a lot of serious trouble with the law as he was growing up. He was convicted of a sexual assault while in Sandpoint and was sent to the Cottonwood facility." The defense objected to Ridley being confronted with her statements, pointing out that defendant did not "go to Cottonwood for [the Sandpoint assault]," having instead "spent a couple of months in county jail."

The assault the parties were referring to concerned 12-year-old Jennifer E. The parties agreed that defendant pleaded to a misdemeanor assault charge and was sentenced to the local jail for the incident. The trial court nonetheless allowed Ridley to be impeached with her pretrial statements, reasoning that if she "had knowledge of — of a sexual assault that he had been convicted of and, she believes, sent to prison," then "even though those aren't the facts, . . . it directly impeaches her testimony" that he "hasn't hurt anyone up until the past few years." In accordance with the court's ruling, the prosecutor asked Ridley, "Did you tell Investigator Hanley and Investigator Hobson . . . that your son, Rex, got into a lot of serious trouble with the law as he was growing up?" Ridley answered yes, and the prosecutor followed up with, "Okay. And that's when you told them that he was convicted of a sexual assault while in Sandpoint and was sent to the Cottonwood facility?" Ridley again answered, "Yes."

The prosecution likewise cross-examined several witnesses by referring to Ridley's pretrial statement that defendant "was convicted in Sandpoint Idaho of a sexual assault." Although these witnesses were examined before Jennifer E. took the stand, Jennifer did testify. She told the jury that one evening in February 1984, she found defendant on top of her, trying to unzip her and his pants after she told him that she did not want to have sex with him. As she continued to struggle, defendant punched her "hard" "on the forehead, the eye area, and . . . on the jaw." The defense disputed few of the details of the assault, simply drawing out that alcohol had been involved.

### b. Analysis

Defendant asserts the prosecutor committed misconduct by "insinuat[ing]" to the jury during cross-examination that defendant was convicted of yet another sexual assault in addition to those relating to Shelley C., A.C., and the two murder victims in this case. We reject the claim.

It is well established that a prosecutor may not " 'ask questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist.' " (*People v. Bolden* (2002) 29 Cal.4th 515, 562.) Under this standard, the prosecution did not commit misconduct in questioning defendant's mother. As the trial court explained, the prosecution did not pose the complained-of question to Ridley to suggest that defendant was convicted of a sexual assault and sent to Cottonwood prison. Instead, he was asking her that question to establish an inconsistency in her testimony: that she *believed* her son, at 18, was sent to prison for sexual assault

and yet still maintained that "until the last few years, [he] has hurt no one."

A different analysis is called for when the prosecution asked other witnesses about Ridley's statement. With these witnesses, the prosecution was not seeking to establish inconsistencies, but rather implying the truth of its questions: that defendant's mother believed he was convicted of a sexual assault because he was, in fact, convicted of such an assault. At no point during trial, however, did the prosecution imply that the sexual assault conviction was some conviction other than that relating to Jennifer E. And Jennifer E.'s testimony — largely uncontradicted by the defense — indicated that defendant sexually assaulted her. Defendant struck Jennifer while trying to undo her pants after she refused to have sex with him. Under such circumstances, it is hardly misleading to call defendant's act a sexual assault. Indeed, all witnesses who referred to the Jennifer E. incident described it as a sexual assault of some sort. Defendant himself admitted in his interview with Hobson that he attempted to rape a "young girl" when he was 18. Dr. Berlin, the main defense expert, similarly testified that "[a]t the age of 18, [defendant] . . . forced himself sexually upon a young lady."

To the extent that defendant now claims that he was not convicted of sexual assault, he seems to be drawing a hyper-technical distinction: that his conviction for misdemeanor assault, which stemmed from sexual assaultive conduct, was different from "a conviction of sexual assault." We are not convinced that the distinction, if it exists, is meaningful. Whether or not defendant was convicted of the specific crime of sexual assault, he was convicted for conduct that any reasonable jury would think of as sexual assault. As such, the prosecutor's

questions did not result in prejudice. (E.g., *People v. Cunningham* (2001) 25 Cal.4th 926, 1019.)

### 7. *Prosecutor's remarks in opening and closing statements*

Defendant argues that the prosecutor committed multiple instances of misconduct in his opening and closing remarks. " ' "As a general rule, a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894 (*Covarrubias*).)

Except as noted below, defendant failed to object to the comments of which he now complains. Because an objection and request for an admonishment would not have been futile, defendant has forfeited his claims. (E.g., *People v. Clark* (2011) 52 Cal.4th 856, 960 (*Clark*); *Spencer, supra,* 5 Cal.5th at p. 683; cf. *People v. Bandhauer* (1967) 66 Cal.2d 524, 530 [permitting the defendant to raise the issue of prosecutorial misconduct for the first time on appeal when the ground for objection was not "apparent" until it was "too late to cure the error by admonition"].) And, forfeiture aside, we find no merit to defendant's arguments.

### a. *Use of the word "animal" and "argumentative attacks"*

Defendant begins by complaining that the prosecution called him an "animal." In its opening statement, the prosecution recounted the incident with A.C. After describing how defendant broke into A.C.'s house, struggled with her down the hallway, and banged her head on the wall, prosecutor said,

"finally this animal bites her on the finger so bad he cuts the tendons in her finger."

"Argument may include opprobrious epithets warranted by the evidence. [Citation.] Where they are so supported, we have condoned a wide range of epithets to describe the egregious nature of the defendant's conduct," including " 'monstrous,' " " ' "perverted murderous cancer," ' " " ' "human monster," ' " and " 'mutation.' " (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1172 (*Zambrano*).) No one disputes that defendant bit A.C.. Accordingly, an isolated reference to defendant as an "animal" who bit his victim does not amount to misconduct.

Defendant further objects to "argumentative attacks" on his trial counsel. As part of his opening statement, the prosecutor highlighted defendant's criminal record and said, in light of such record, it was "absolutely amazing" that defense counsel would "want . . . you to give him a break." The prosecutor also emphasized the expected victim impact statements. Referring to the defense attorney who argued that, by confessing, defendant "was the one who helped bring closure" to the victims' families, the prosecutor said, "[s]he doesn't understand this. There has been no closure for these families." We fail to see any misconduct. "When the comments are considered in context, there is no likelihood that the jury would have understood the comments as anything beyond criticism of defense counsel's tactical approach in argument and the defense view of the evidence in the case, as is allowed." (*Linton, supra*, 56 Cal.4th at p. 1206.)

### b. *Comments on defense mitigation strategy, experts, and counsel*

Defendant complains that the prosecutor improperly denigrated his mitigation strategy, expert witnesses, and trial counsel. Defendant's strategy at the penalty phase was to offer evidence of his childhood abuse, mental illness, and the failure of various institutions to treat him. The prosecution previewed this strategy by telling the jury, "[t]he evidence you will be presented with from these defense attorneys will try to blame everybody but their client. They'll call it an explanation, but it's really a blame game. They're going to blame the State of Idaho. They're going to blame the State of California. . . . Mostly they're going to blame [defendant's] father." The prosecutor returned to the same theme in closing argument, arguing that defense was "trying to deflect . . . responsibility" and instead "lay some kind of a guilt trip on you for what their client truly deserves." The prosecutor also characterized the defense as offering an " 'abuse excuse.' "

We find no misconduct. The thrust of the prosecutor's argument was that defendant alone was responsible for his crimes and could not shift the blame onto others, even if he did suffer abuse, mental disorder, and lack of treatment. There is nothing "deceptive" or "reprehensible" about such an argument. (E.g., *People v. Gonzales* (2011) 51 Cal.4th 894, 947 (*Gonzales*).) "Prosecutors may attack the defense case and argument. 'Doing so is proper and is, indeed, the essence of advocacy.' " (*People v. Thornton* (2007) 41 Cal.4th 391, 455 (*Thornton*).) Likewise, the prosecutor's use of pungent language, calling defense strategy a "blame game," "guilt trip," or "abuse excuse," does not rise to the level of misconduct. (E.g., *ibid.* [no misconduct in the prosecutor's suggestion that "defendant was relying on an

'abuse excuse' "]; *People v. Davis* (1995) 10 Cal.4th 463, 539 (*Davis*) [no misconduct when the prosecutor said the defense strategy was " 'to attack and smear everybody they could in the hopes of somehow deflecting or diffusing blame' " and " 'to try to lay a guilt trip on you' "].)

As part of the same argument, defendant also objects to the prosecutor's attacks on the credibility of Drs. Berlin and Haney. Defendant did not lodge specific objections against these statements.[21] And even if he did, " 'harsh and colorful attacks on the credibility of opposing witnesses are permissible.' " (*Clark, supra,* 52 Cal.4th at p. 962.) So, too, are remarks "to expose bias in the witness[es] by showing [their] propensity to advocate for criminal defendants even in extreme cases." (*Zambrano, supra,* 41 Cal.4th at p. 1165.) Accordingly, none of the prosecutor's remarks amounts to misconduct.

Finally, defendant accuses the prosecutor of having impugned the integrity of defense counsel. In his closing argument, the prosecutor posed the rhetorical question, "You think they just pick these witnesses out of a hat? You think a lot of this defense was orchestrated?" Later, referring to the fact that Dr. Haney sat in on an interview that Dr. Berlin conducted with defendant, the prosecutor said, "What kind of professionalism is that? . . . [¶] Why did they do that? Was it to get all the ducks in a row?"

---

[21] Defendant did object when the prosecutor said "to show you how absolutely ridiculous the defendant's psychology team is, we will present Dr. Park Dietz." The objection, however, was on the ground that the prosecution should not be able to "reference . . . any rebuttal evidence . . . in opening statement," an objection entirely different from the argument now raised on appeal.

It is true that "[a] prosecutor is not permitted to make false or unsubstantiated accusations that counsel is fabricating a defense or deceiving the jury." (*Clark*, *supra*, 52 Cal.4th at p. 961.) In context, however, the prosecutor's statement that the "defense was orchestrated" does not appear to rise to an insinuation of deceit. The prosecutor contrasted "orchestrated" with "pick[ing] . . . witnesses out of a hat." So by saying that the defense was "orchestrated," the prosecution seemed to mean that it was carefully crafted, or presented with a deliberate selection of witnesses. Of course, there is nothing untoward in a careful selection of witnesses. But then it is not misconduct either to tell the jury that as the opposing party was deliberate and selective in its presentation, the jury should be aware of the fact and judge the case accordingly. (Accord, *Davis*, *supra*, 10 Cal.4th at pp. 538-539 [rejecting the claim that the prosecution accused the defense of "manipulating witnesses and suppressing testimony of uncooperative witnesses" when it suggested that the defendant's brother, unlike his sisters, did not testify because " 'he knew what they wanted and wasn't willing to do it' "].)

Likewise, the statement that the defense witnesses interviewed defendant together "to get all the ducks in a row" was not misconduct. The prosecution implied that the defense coordinated its experts but stopped short of insinuating that the experts lied. In any event, the comment was brief and interposed in the middle of a lengthy closing argument. It did not result in prejudice.

### c. *Asserted statement of personal belief*

Defendant asserts the prosecutor improperly injected his personal belief by beginning his closing statement with the

following: "While some of us have been working on this case for over two years now . . . you, too, have now devoted a significant portion of your lives to this case. . . . [¶] You realize now what so many of us have realized for a long time. You realize now you have been in the presence of one of the most cruel, calculating, and brutal individuals on the planet, Rex Allan Krebs."

Prosecutors may not "base argument on facts not in evidence" or otherwise seek to " ' "bolster their case 'by invoking their . . . depth of experience, or the prestige or reputation of their office.' " ' " (*Mendoza*, *supra*, 62 Cal.4th at p. 906; *Linton*, *supra*, 56 Cal.4th at p. 1207.) Here, the prosecutor did not do either of those things. At closing argument, after the jury has heard all the evidence, the prosecutor urged it to "realize" that defendant was a most "cruel, calculating, and brutal individual[]." Although the prosecutor indicated that by coming to such a realization, the jury would be agreeing with the prosecution's poor opinion of defendant, it nowhere suggested that the prosecution formed that opinion based on " ' "evidence available to the government, but not before the jury." ' " (*Linton*, *supra*, 56 Cal.4th at p. 1207.) Nor did it imply that the jury should adopt the prosecution's view because of its " ' " prestige, reputation, or depth of experience." ' " (*Ibid.*) Accordingly, there was neither impermissible vouching nor reliance on evidence outside the record.

### d. Asserted mischaracterization of Drs. Berlin and Haney's testimony

Defendant raises additional issues relating to the prosecutor's characterization of Drs. Berlin's and Haney's testimony. With regard to Berlin, defendant objects to the portion in the prosecutor's closing argument in which he said: "the defense attorney[] seeks out Dr. Berlin from across the

114

country. Can't find somebody in California. Can't even find somebody west of the Rockies. Gets Dr. Berlin from across the country to travel to California."

Generally, "prosecutors have wide latitude to discuss and draw inferences from the evidence presented at trial." (*Thornton*, *supra*, 41 Cal.4th at p. 454.) In this case, no one disputed that Dr. Berlin was affiliated with Johns Hopkins University and so was "from across the country." The implication of the prosecution's statements goes further than that, however. By remarking that "the defense . . . can't . . . find somebody west of the Rockies" and had to go "across the country" to "seek[] out Dr. Berlin," the prosecution implied that Berlin's views were idiosyncratic, not shared by anyone "west of the Rockies." Yet Dr. Dietz — the prosecution's own witness — testified that although he and Berlin disagreed, "we're in an area where there are competing points of view" and Dietz respected his colleague's opinion. The prosecution also represented during voir dire that Berlin was "one of the top psychologists in the country." As such, there is some tension between the prosecutor's closing argument and what he and his expert had said elsewhere.

Nonetheless, even assuming the prosecutor overstepped his bounds, any error is not prejudicial. The jury was told of Dr. Berlin's credentials, that he was "an associate professor at the John[]s Hopkins University," "an attending physician at the John[]s Hopkins's Hospital," "the founder of the John[]s Hopkins Sexual Disorders Clinic," and the director for a national institute on sexual trauma. In addition, the jury knew that Berlin had published in peer reviewed journals, spoken to judges, appeared before senators, and been certified by numerous professional boards. It also knew that Berlin did the

same residency at Johns Hopkins and served on the same "DSM publication committee" as Dr. Dietz. In addition, the jury heard a direct rebuttal to the charge that the defense "couldn't find a doctor west of the Rockies." As defendant's attorney stated, "We went to John[s] Hopkins. They went looking for the best guy they could find. We went looking for the best guy we could find. They're both from John[s] Hopkins."

Finally, the court instructed the jury regarding expert testimony. It twice told the jury to "consider the qualifications and believability of the witness" as well as the underlying bases for their opinions. The instructions for the jury to focus on the relevant matters, combined with the rebuttal revealing the tenuous ground on which the prosecution asserted that Dr. Berlin's opinion could not be found "west of the Rockies," eliminated any reasonable possibility that the jury would have been persuaded to reach a different penalty verdict absent the prosecutor's challenged comments.

With regard to Dr. Haney, defendant is correct that the prosecution misstated the record when it said, "He called him the 'Hole Boy.'" The term "hole boy" or "hole kid" referred to the period of time that defendant spent in isolation during his stay at Cottonwood prison. Defendant had represented to Haney that he did a significant amount of time in isolation, going so far as call himself the "Hole Kid." But it was defendant who gave himself that name; Haney did not call defendant the "hole kid" or "hole boy."

It is clear, however, that the misstatement does not warrant reversal of the death judgment. The moniker "hole boy" or "hole kid" was relevant to the prosecution's argument insofar as it tended to show that Dr. Haney was biased; after all, he

knowingly depended on defendant — a witness with a motive to lie — to supply his social history. To the extent that defendant indeed lied about how much time he spent in isolation, the prosecution's point was valid. The fact that Haney did not call defendant a "hole boy" had little significance.

### e. Exhortation for the jury to be "outraged"

Finally, defendant urges us to find misconduct in a comment the prosecutor made toward the end of his closing statement. "Justice," said the prosecutor, "is not served until the citizens of our community, jurors and citizens alike, are as outraged by what Rex Krebs did as the families of his victims." "[P]rosecutorial references to community vengeance, while potentially inflammatory, are not misconduct if they are brief and isolated, and do not form the principal basis for advocating the death penalty." (*Zambrano*, *supra*, 41 Cal.4th at p. 1178.) The brief comment here does not amount to error.

### 8. Order to submit to psychiatric examination by prosecution expert

Over defense objection, the trial court ordered defendant to be examined by Dr. Dietz. Defendant refused and was not examined, a fact Dietz disclosed during his testimony. The prosecution also mentioned defendant's refusal to be examined in closing argument, stating, "the defendant will spend days talking to Dr. Berlin . . . but when the Court orders the defendant to talk to Dr. Dietz . . . the defendant refused. Where's the fairness in that? Who's looking for the truth?"

On appeal, the Attorney General concedes that the court erred in ordering defendant to be examined by Dr. Dietz. (See *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1109 (*Verdin*) ["any rule that existed before 1990 suggesting or holding a

criminal defendant who places his or her mental state in issue may thereby be required to grant the prosecution access for purposes of a mental examination by a prosecution expert was superseded by the enactment of the criminal discovery statutes in 1990"]; *Gonzales*, *supra*, 51 Cal.4th at p. 927, fn. 15 [applying *Verdin* retroactively].)[22] The Attorney General argues, however, that the error did not cause prejudice. We agree.

This case is much like *People v. Wallace* (2008) 44 Cal.4th 1032, 1087-1088 (*Wallace*), where we found the *Verdin* error harmless. As in *Wallace*, the prosecution expert here "did not rely on defendant's refusal to participate in the court-ordered examination" to criticize his opponent's conclusions. (*Id.* at p. 1087.) Moreover, "the brutality of defendant's crimes . . . weighs heavily in aggravation." (*Ibid.*) Such factors, along with the fact that the defense provided the jury with an explanation of why defendant refused to be examined by Dr. Dietz (because he would have examined defendant with an opinion already formed), lean against a finding of prejudice.

Of course, there are differences between this case and *Wallace* as well. In *Wallace*, the jury "heard [from yet another expert for whom no *Verdin* error occurred] that the reliability of the defense expert testimony was questionable." (*Wallace*, *supra*, 44 Cal.4th at p. 1087.) Furthermore, the prosecutor in *Wallace* did not remark on the defendant's refusal to be examined. Nonetheless, these differences do not persuade us to

---

[22] "Shortly after *Verdin*, the Legislature amended section 1054.3 to expressly authorize courts to compel a mental examination by a prosecution-retained expert. (See § 1054.3, subd. (b), as amended by Stats. 2009, ch. 297, § 1.) But because this case predates that amendment, *Verdin* applies." (*People v. Banks* (2014) 59 Cal.4th 1113, 1193 (*Banks*).)

a different conclusion. The jury here did not hear from another prosecution expert, but it did hear details supporting Dr. Dietz's testimony from both defendant and *his* expert. Dietz testified that defendant's choices showed that he did not suffer from volitional impairment. Defendant's confessions then supplied, in vivid detail, the choices he made, and Dr. Berlin confirmed that defendant consciously stopped resisting his impulses after a bar fight. As for the prosecutor's brief comments in closing argument highlighting defendant's refusal to submit to an interview with Dietz, they do not provide a basis to reprise all of defendant's arguments about opposing party's supposed "venomous treatment of the defense experts." With few exceptions, we have found that the prosecution conducted itself within the bounds allowed by law. Under the totality of the circumstances, "it is not reasonably possible that [in the absence of the *Verdin* error] the jury would have returned a penalty verdict of life without parole . . . rather than death." (*Wallace*, *supra*, 44 Cal.4th at pp. 1087-1088.)

### 9. *Instructions relating to section 190.3*

Defendant raises two arguments regarding the pattern instructions the jury received concerning the aggravating and mitigating factors under section 190.3. We reject both claims.

### a. *Mitigating circumstance*

Using CALJIC No. 8.85, the trial court told the jury: "In determining which penalty is to be imposed on defendant . . . [y]ou shall consider, take into account and be guided by the following factors . . . ." The court then instructed the jury on the various factors enumerated in section 190.3, including, as is relevant here, factors (d) and (h). The court thus instructed the jury that it should consider "[w]hether or not the offense was

committed while the defendant was under the influence of extreme mental or emotional disturbance" and "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication."

Defendant first argues that the pattern instructions above improperly informed the jury that "any listed factor could be considered as aggravation." Specifically, defendant contends that if a jury finds that a defendant did not act "under the influence of extreme mental or emotional disturbance" or was not impaired in his "capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of law," then because of the "whether or not" language of the instruction, the jury will interpret the absence of such mitigating factors to be an aggravating circumstance. We have repeatedly rejected such argument. (E.g., *People v. Miracle* (2018) 6 Cal.5th 318, 354 (*Miracle*); *People v. Wall* (2017) 3 Cal.5th 1048, 1073; *Banks*, *supra*, 59 Cal.4th at pp. 1207-1208; *People v. Cook* (2006) 39 Cal.4th 566, 618 ["CALJIC No. 8.85's use of the phrase 'whether or not,' is not an invitation to jurors who find 'a factor not proven' to then 'use that factor as a factor favoring imposition of the death penalty' "]; *People v. Sapp* (2003) 31 Cal.4th 240, 315.) We once again reject it here.

To the extent defendant attempts to rely on other instructions to bolster his argument, we find the effort unpersuasive. For instance, defendant points to statements the court made to certain jurors during voir dire. These earlier statements do not help defendant, as the jury was instructed to "[d]isregard all other instructions given . . . in other phases of th[e] trial" before entering penalty deliberation.

Similarly, the fact that the court gave a jury instruction patterned on CALJIC No. 8.88 adds little to defendant's claim. This instruction defined "[a]n aggravating factor [a]s any fact, condition or event attending the commission of a crime which increases its guilt or enormity." Defendant asserts that under this definition, the jury may have considered his mental illness and intoxication — the same circumstances mentioned under section 190.3, factor (h) — as aggravating because they were "fact[s], condition[s], or event[s] attending the commission of the crime."

We agree that the jury may indeed have drawn this conclusion, but find no impropriety thereby. Both parties here agreed that defendant's alcohol use and mental disorder (whether it be sexual sadism, as claimed by the defense, or antisocial personality disorder, as argued by the prosecution) were drivers behind his abductions, rapes, and ultimately, murders of Newhouse and Crawford. As such, defendant's intoxication and mental disorders were relevant to "circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true." (§ 190.3, factor (a).) Hence, the jury may properly have considered them aggravating, even though they "also bear[] upon a mitigating factor" listed in section 190.3. (*People v. Smith, supra*, 35 Cal.4th at p. 356.)

Put differently, although impairment as a result of a mental disorder or intoxication is always mitigating, the mere presence of a mental disorder or intoxication is not. In cases where a mental disorder and/or drunkenness relate to the circumstances of the crime, they may be aggravating and it is not error to allow the jury to consider them as such. (See *People*

*v. Smith*, *supra*, 35 Cal.4th at p. 356 ["evidence of mental illness . . . is admissible in the prosecution's case-in-chief [as an aggravating circumstance] if, as here, it relates to an aggravating factor listed in section 190.3"].)

In sum, we reject defendant's claim that the pattern instructions improperly allowed the jury to consider any strictly mitigating circumstance as aggravating.

### b. *Vagueness*

Defendant argues that section 190.3, factor (h) is unconstitutionally vague. Specifically, he contends the instruction is infirm because (1) it fails to define the phrase "mental disease or defect" and (2) it does not adequately explain "the concept of volitional capacity impairment conveyed by the phrase 'capacity . . . to conform his conduct to the requirements of the law was impaired.' " We disagree.

Defendant's argument about the term "mental disease or defect" in section 190.3, factor (h) is, by and large, a reprisal of his contention that the trial court needed to define the term on its own motion. Defendant once again asserts that the phrase is not " 'commonly understandable' " given Dr. Dietz's testimony. However, as we have earlier explained, although Dietz espoused a narrow definition of "mental disease or defect," the testimony, arguments, and instructions considered in their entirety did not preclude the jury from treating defendant's mental conditions as mitigating. Accordingly, even assuming that the instruction was vague, no prejudicial error occurred.

We further reject defendant's argument concerning the asserted vagueness of the phrase "the capacity of the defendant . . . to conform his conduct to the requirements of law was impaired as a result of mental disease or defect." (§ 190.3, subd.

(h).) Defendant claims that such language is vague because "[w]hen a person 'gives in' to an impulse, urge, craving or desire which is associated with a mental illness, and commits a crime," it is not clear whether "the act of 'giving in' or acting on the urge properly [is] considered an act of free will, or . . . an act evidencing an impaired capacity to control one's behavior." Yet, if this is the difficulty, then defendant's argument boils down to nothing more than that the jury had a difficult job to do. It fell upon the jury to sift between competing testimony, theories, and arguments to draw its own conclusion about whether defendant's actions evidenced "an impaired capacity to control one's behavior" or the choice not to resist evil impulses. This is a factual question on which no instruction of law could have provided the answer. The factor is not vague just because its application to specific facts is an irreducibly difficult task. (Accord, *Tuilaepa v. California* (1994) 512 U.S. 967, 977 ["difficulty in application is not equivalent to vagueness"].)

### 10. *Constitutionality of California's death penalty scheme*

Defendant argues California's death penalty scheme is unconstitutional, although he concedes that we have repeatedly rejected such arguments. Because defendant advances no persuasive reason for us to revisit the issues, we continue to hold as follows.

"California's death penalty laws adequately narrow the class of murderers subject to the death penalty." (*Powell*, *supra*, 5 Cal.5th at p. 963.)

The death penalty statute is not unconstitutional despite not requiring "findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor

(b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235.)

"Because capital defendants and noncapital defendants are not similarly situated, California does not deny capital defendants equal protection by providing certain procedural protections to noncapital defendants but not to capital defendants. [Citation.] In particular, written findings by a jury recommending a death sentence are not required." (*Spencer*, *supra*, 5 Cal.5th at p. 695.)

Section 190.3, factor (a) is not unconstitutionally overbroad, arbitrary, capricious, or vague as applied. (*Miracle*, *supra*, 6 Cal.5th at p. 353.)

Intercase proportionality review is not required. (*Mendoza*, *supra*, 62 Cal.4th at p. 916.)

The use of unadjudicated criminal activity as an aggravating factor under section 190.3, factor (b) does not violate constitutional mandates. (*Merriman*, *supra*, 60 Cal.4th 1, 106.)

The trial court "was not required to instruct the jury that the statutory mitigating factors were relevant solely to mitigation, and the court's instruction directing the jury to consider 'whether or not' certain mitigating factors were present did not invite the jury to use the absence of such factors as an aggravating circumstance, in violation of state law and the Eighth and Fourteenth Amendments." (*Powell*, *supra*, 5 Cal.5th at p. 964.)

"Prosecutorial discretion and the absence of standards for deciding whether or not to seek the death penalty in an eligible

case" do not render California's death penalty laws unconstitutional. (*Merriman*, *supra*, 60 Cal.4th at p. 107.)

The death qualification process of jurors does not violate the United States Constitution or international law. (*Covarrubias*, *supra*, 1 Cal.5th at p. 868.)

Victim impact evidence "is admissible as a circumstance of the crime under section 190.3, factor (a)." (*Spencer*, *supra*, 5 Cal.5th at p. 676.) The use of such evidence is neither "nonstatutory" nor "unrestricted."

The imposition of the death penalty under California's law does not violate international law or prevailing norms of decency. (*Clark*, *supra*, 52 Cal.4th at p. 1008.)

The delay in executing a condemned inmate does not violate the Eighth Amendment. (*People v. Ochoa* (2001) 26 Cal.4th 398, 462-464.) The rarity of executions does not result in arbitrary results. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1371-1375.) Contrary to the argument raised in defendant's supplemental brief, the Governor's moratorium on the death penalty does not compel the court to reexamine these holdings. (Governor's Exec. Order No. N-09-19 (Mar. 13, 2019) [stating that the order "does not . . . alter any current conviction or sentence" and likewise "does not[] create any rights or benefits . . . enforceable at law"].)

## III. DISPOSITION

The judgment is affirmed in its entirety.


**CANTIL-SAKAUYE, C. J.**


**We Concur:**

**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Krebs

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S099439
**Date Filed:** November 21, 2019

_____

**Court:** Superior
**County:** San Luis Obispo
**Judge**: Barry T. LaBarbera


_____

**Counsel:**

Neil B. Quinn, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Keith H. Borjon, Sharlene A. Honnaka, A. Scott Hayward and Kenneth C. Byrne, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Neil B. Quinn
Attorney at Law
300 Douglas Street
Ojai, CA 93023
(805) 646-5832

Kenneth C. Byrne
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6008